No. 118,842

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

Estate of ICARUS RANDOLPH, et al.,
*Appellants*,

v.

CITY OF WICHITA, KANSAS, et al.,
*Appellees*.

SYLLABUS BY THE COURT

1.

Standards for granting summary judgment and review on appeal are stated and applied.

2.

The Kansas Tort Claims Act strips away sovereign immunity and makes government entities and their employees liable for their negligent and otherwise tortious conduct to the same extent as their private sector counterparts, subject to a set of specific statutory immunities. Municipal liability is the rule and immunity the exception. As a general matter, the immunities are to be narrowly construed consistent with the overarching rule of governmental liability.

3.

Immunity under the Kansas Tort Claims Act constitutes a legal avoidance of or affirmative defense to liability, so the governmental party asserting an immunity bears the burden of proving its applicability at trial.

1

4.

A person threatened with physical harm has a right to respond with a display of force or the actual use of force including, in certain circumstances, deadly force. The response, however, must be reasonably calibrated to the apparent harm. Self-defense is an avoidance in a civil action for damages, so the defendant relying on it bears the burden of proof.

5.

To act in self-defense under K.S.A. 2018 Supp. 21-5222, a person must "reasonably believe" both a physical threat exists and the degree of force he or she uses in response to be necessary under the circumstances. The required statutory belief has subjective and objective components, meaning, first, the person must honestly believe he or she is in immediate danger necessitating the use of that degree of force against an aggressor (subjective component) and, second, an objectively reasonable person would also view the circumstances that way (objective component).

6.

Actionable negligence first requires that the alleged wrongdoer owe a legally recognized duty of due care to the injured party, and the wrongdoer must then breach that duty in a way causing the injury. Lack of due care typically entails doing something a reasonable person would not do under the circumstances or failing to do something a reasonable person would do. Whether a duty exists presents a question of law. Breach of a lawful duty and the causal connection between a breach and the claimed injury are questions of fact.

7.

The discretionary function immunity in K.S.A. 75-6104(e) protects the choice among otherwise reasonable options. So a government agent cannot be successfully sued for selecting one reasonable course of action over other reasonable approaches, although

2

one of the discarded approaches arguably might have been better. The method of choosing among them or exercising that discretion is shielded, even if the method is largely unstudied, wholly arbitrary, or abused. The immunity does not protect a government agent's choice of a patently unreasonable or plainly wrongful course of conduct over other options.

8.

If a policy or procedure dictates a precisely defined course of conduct or result, then discretionary function immunity under K.S.A. 75-6104(e) cannot apply for the very reason that the policy or procedure necessarily precludes choosing among options or the exercise of what would be protected discretion.

9.

A civil assault entails the threat of bodily harm coupled with the apparent ability to carry out the threat resulting in the victim's immediate apprehension of harm. The actionable injury is the victim's apprehension and, thus, his or her mental disturbance resulting from the threat.

10.

Civil battery entails an unprivileged intentional touching with the purpose of bringing about a harmful or offensive contact. The compensable harm derives from the nature and extent of the contact.

11.

The Kansas Tort Claims Act immunity in K.S.A. 75-6104(i) incorporates or adopts immunities originating in some other legal source that apply to the claim being litigated. Adoptive immunity does not extend qualified immunity afforded government agents for alleged violations of federal statutory or constitutional law to state law tort claims for assault or battery.

3

12.

The law governing intentional torts incorporates transferred intent or liability so that a person intending to commit an assault or battery against one individual may be liable if he or she causes actionable harm to someone other than the intended victim.

13.

A claim for the intentional infliction of emotional distress or the tort of outrage requires: (1) the defendant act intentionally or in reckless disregard of the plaintiff; (2) the actions must be "extreme and outrageous"; (3) the plaintiff has to experience "extreme and severe" mental distress; and (4) the plaintiff's mental distress has to be causally connected to the defendant's actions. The wrongdoer need not intend to cause the victim emotional distress. Rather, the tort requires that the intentional conduct so far exceed societal norms that it may be fairly characterized as exceptionally vile, reprehensible, or intolerable.

14.

Individuals may recover for the negligent infliction of emotional distress only if they have also suffered near contemporaneous physical harm distinct from common physical symptoms of the claimed emotional distress.

Appeal from Sedgwick District Court; WARREN M. WILBERT, judge. Opinion filed January 21, 2020. Affirmed in part, reversed in part, and remanded with directions.

*John A. Kitchens*, of Wakarusa, and *Lee R. Barnett*, of Lee R. Barnett, P.A., of Wakarusa, for appellants.

*Samuel A. Green* and *J. Steven Pigg*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellees.

Before ATCHESON, P.J., MALONE and LEBEN, JJ.

4

ATCHESON, J.:  A Wichita police officer fatally shot Icarus Randolph in the front yard of his home shortly after noon on July 4, 2014, as family members gathered there to celebrate the holiday. Randolph had a history of mental illness. He seemed upset or angry that morning and had become nonresponsive to his family. Randolph's mother called 911 to secure assistance in transporting him to a mental health facility. Two officers separately responded to the call. Less than 13 minutes later, Officer Ryan Snyder shot Randolph four times.

Randolph's estate and members of his family who witnessed the shooting filed a civil action for damages under the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 et seq., against Snyder, the other officer at the scene, and the City of Wichita as their employer. The suit alleges various theories of liability grounded in negligence and intentional tortious conduct. The City and the officers denied any liability. The Sedgwick County District Court granted summary judgment to the defendants on all of the claims against them. The plaintiffs have appealed. The summary judgment record contains disputed issues of material fact bearing particularly on the intentional torts, so the district court erred in its blanket dismissal. We affirm in part, reverse in part, and remand for further proceedings.

STANDARD OF REVIEW, FACTUAL BACKGROUND, AND PROCEDURAL HISTORY

*Summary Judgment Standards*

Because the plaintiffs have appealed a summary judgment entered against them, we begin by outlining the standards district courts are to apply in making those rulings and we then use in reviewing them. The standards guide how we consider the competing descriptions of the relevant facts the parties say depict the final minutes of Randolph's life and how he came to die.

5

The defendants, as the parties seeking summary judgment, had the obligation to show the district court, based on appropriate evidentiary materials, there were no disputed issues of material fact and judgment could, therefore, be entered in their favor as a matter of law. *Trear v. Chamberlain*, 308 Kan. 932, 935, 425 P.3d 297 (2018); *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009). In essence, they argued there was nothing for a jury or a district court judge sitting as fact-finder to decide that would make any difference. Where, as here, the parties seeking summary judgment rely on affirmative defenses, avoidances, or other legal grounds on which they would bear the burden of proof at trial, they must identify undisputed evidence establishing those points. *Golden v. Den-Mat Corporation*, 47 Kan. App. 2d 450, Syl. ¶ 20, 276 P.3d 773 (2012).

In opposing summary judgment, the plaintiffs had to cite record evidence calling into question a material factual representation defendants made in support of their motion. *Trear*, 308 Kan. at 935-36; *Shamberg*, 289 Kan. at 900. When a party has identified disputed material facts, the motion should be denied in favor of a trial to permit a judge or jury to resolve those disputes after hearing witnesses testify in court and reviewing any relevant documentary evidence.

In addressing a request for summary judgment, the district court must view the evidence most favorably to the party opposing the motion and give that party the benefit of every reasonable inference that might be drawn from the evidentiary record. *Trear*, 308 Kan. at 935-36; *Shamberg*, 289 Kan. at 900. An appellate court applies the same standards in reviewing the entry of a summary judgment. Because a summary judgment presents a question of law—it entails the application of legal principles to uncontroverted facts—an appellate court owes no deference to the district court's decision to grant the motion, and review is unlimited. See *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009).

In its journal entry, the district court made no effort to outline the controlling factual representations or to determine if any of them were materially disputed. Rather, the district court simply adopted by rote all of the individual factual representations the defendants offered in support of their motion and virtually all of the counter representations the plaintiffs submitted in opposition. The journal entry, thus, contains nearly 1,000 purported statements of uncontroverted fact. Most of the factual statements aren't especially relevant to the issues on summary judgment. And a number of them really are opinions or conclusory assertions. As we discuss, some of the most salient facts actually have been disputed in the evidentiary record submitted to the district court.

Although we have, of course, looked at the factual findings set out in the district court's journal entry, we have been principally guided by the parties' references in their appellate briefs to those findings and the corresponding parts of the record they consider salient to their legal arguments. As to the affirmative defenses, for example, the defendants have an obligation to set out in their brief the facts material to those issues with citations to where we may find evidence in the record supporting each fact. See Kansas Supreme Court Rule 6.03(a)(3) (2019 Kan. S. Ct. R. 35). We have relied on what the parties have done to satisfy that obligation.

*Factual and Procedural History*

We offer a condensed factual account focusing on the events directly and immediately bearing on the legal claims. The parties are familiar with the extensive background circumstances developed in discovery and outlined in the summary judgment papers, so we do not recite all of that here. Consistent with the standard of review, we offer a narrative in a light favoring the plaintiffs, recognizing there are differing accounts of some of the facts. We mention some of the central discrepancies, but it is not up to us to resolve them now.

Randolph was 26 years old when he died. He had a history of significant and sometimes debilitating mental illness. For several years, Randolph had been living with his mother Beverly Alford-Allen. The summary judgment evidence does not provide a formal clinical diagnosis of Randolph. But the materials include records from several mental health care providers who had seen Randolph in the preceding several months. The records variously described Randolph as sometimes delusional, semi-catatonic, and disordered in his thinking.

The morning of July 4 family members began arriving at the home in anticipation of a cookout later in the day. As we indicated, Randolph was out of sorts—some family members later characterized his disposition as upset or angry. He rebuffed efforts to improve his mood. As the morning wore on, Randolph became more withdrawn and ultimately unresponsive. He had an open pocket knife in his hand much of the time. Although Randolph did not threaten his relatives, they were concerned about his immediate well-being and concluded he probably again needed to be admitted to a mental health facility.

About eight weeks earlier, Randolph had become similarly unresponsive, prompting his mother to seek assistance by calling 911 or having a neighbor call on her behalf. The police officers dispatched to the home then helped in getting Randolph transported by ambulance to an in-patient treatment center in Wichita.

So on July 4, Randolph's mother called 911. Police Officer Danny Brown was the first to arrive at the house. He met Randolph's mother and other family members in the front yard and had begun talking with them when Officer Snyder arrived. Randolph remained inside. Snyder immediately took control of the discussion. Based on the summary judgment evidence, Brown then literally and figuratively stood aside. Both

8

officers knew they had been sent to assist with a mentally ill person rather than to investigate a crime.

Alford-Allen and the other family members perceived Snyder as dismissive of their concerns and unwilling to call for an ambulance. He indicated that unless Randolph was dangerous to himself or others or consented to treatment, the authorities could not intervene. An increasingly exasperated Alford-Allen explained what had happened before when she contacted 911. She asked that Snyder have a supervising officer come out. In the meantime, at least one family member called 911 and was forwarded to Snyder.

Sometime after Snyder arrived—how long isn't particularly clear—Randolph became noticeably agitated. The people in the front yard could hear him making indistinct noises and moving or throwing furniture around. Suddenly, Randolph burst through a screen door and began walking across the front yard. In later accounts, those in the front yard offered differing descriptions of Randolph's movements. Family members said he was strolling almost aimlessly with what has been called a thousand-yard stare— meaning a vacant, unfocused gaze—and his hands at his sides. Snyder described Randolph as walking quickly and "aggressively"; he said Randolph looked directly at him.

Briana Alford, one of Randolph's sisters, said everyone except Snyder stepped away from Randolph. She described Snyder as moving into Randolph's path. Ida Allen, another sister, said Snyder went toward Randolph and "put himself there" as if he "went like to engage" Randolph. Several family members told Randolph to go back into the house, but he appeared oblivious to their requests. Randolph still had the knife in one of his hands, although everyone seems to agree that he had not raised his hands or brandished the knife.

As Randolph came closer, Snyder drew his Taser and fired it at Randolph. The evidence indicates at least one of the two pronged wires from the Taser struck Randolph, but he did not stop walking in response to the electrical charge. In his deposition, Snyder testified that as Randolph was shocked, he lifted his arms and hands. Snyder said he then saw the knife for the first time. The knife had a four-inch blade. In his deposition, Snyder testified he was certain that Randolph was getting ready to stab him. But Snyder also testified in the same deposition that Randolph may have involuntarily lifted his arms in response to the Taser charge. And Snyder acknowledged that in a tape-recorded statement he gave shortly after Randolph's death, he said, "[W]ell, he has a knife now, maybe he is trying to come up and stab [me]."

After seeing the knife, Snyder dropped the Taser and drew his pistol. As he backed away and as Randolph continued to walk forward, Snyder fired four shots at Randolph's chest. Randolph immediately fell to the ground and may have been within 6 feet of Snyder. The knife lay in the grass next to Randolph. The evidence indicates Randolph quickly died from the gunshot wounds. Alford-Allen ran toward Randolph after he had been shot and had collapsed. Snyder pointed his pistol at her and ordered her to back away from Randolph. One of the officers reported to the police dispatcher that shots had been fired and requested an ambulance.

In his deposition testimony, Snyder said he had backed up almost against a car parked in the driveway when he shot Randolph. He acknowledged he had three "avenues of escape." He could have "go[ne] over the car"; he could have gone to the right toward the backyard, although he would have encountered a fence; or he could have gone to the left toward the street. Snyder has not asserted Randolph committed a crime or, more precisely, that he was attempting to arrest Randolph when he used his Taser or fired his pistol.

Randolph's estate and his relatives present at the home filed a civil action in the district court on June 30, 2015, against Snyder and Brown. They amended the petition without objection about six months later adding the City of Wichita as a defendant. The record shows the parties spent almost two years in discovery, punctuated by many motions to the district court to resolve an array of disputes. As we have indicated, the defendants filed a joint motion for summary judgment premised on their lack of legal liability on any of the plaintiffs' claims. The plaintiffs duly responded. The district court filed its journal entry granting summary judgment to the defendants on January 2, 2018. Plaintiffs have appealed.

LEGAL ANALYSIS

*Summarizing the Claims at Issue*

At the outset, we draw from the amended petition to identify specifically the plaintiffs and their legal claims at issue on appeal:

• Estate of Icarus Randolph.

The estate alleges:

(1) A negligence claim against Snyder for failing to follow police department policies after he arrived at the Randolph residence, particularly Policy 519 pertaining to contacts with mentally ill persons in need of assistance. Had Snyder conformed his conduct to the policy, the estate contends the situation would not have escalated to a fatal shooting.

(2) A negligence claim against Brown for failing to intervene when Snyder deviated from Policy 519;

11

(3) Negligent use of force by Snyder for deploying his Taser and firing his pistol; and

(4) The intentional torts of assault and battery against Snyder for deploying his Taser and his pistol.

The estate also alleges what it characterizes as a wrongful death claim against Brown and Snyder under K.S.A. 2018 Supp. 60-1901(a). The wrongful death statute allows the recovery of specified damages when one person's "wrongful act or omission" results in the death of another person. So any liability of Brown or Snyder rests on the wrongful conduct otherwise attributed to each of them causing Randolph's death.

• Family members: Beverly Alford-Allen; Briana Alford; Ida Allen; Saul Gallego, Randolph's nephew; Elisa Allen, another of Randolph's sisters; and Elisa Allen's minor children Tyree Straughter, Jr., Tylisia Straughter, and Adore Potts. They allege:

(1) Snyder was negligent in failing to follow police policies, including Policy 519, leading to Randolph's death and to tortious conduct directly harming them;

(2) Snyder committed the intentional tort of assault against them, when he displayed his Taser and drew his pistol; and

(3) Snyder negligently and intentionally inflicted emotional distress on them based on his conduct leading up to and then fatally shooting Randolph.

• Beverly Alford-Allen. She alleges a separate claim of assault against Snyder when he pointed his pistol at her as she approached Randolph after he had been shot.[1]

12

[1]The plaintiffs included a number of additional theories of recovery in their amended petition. Those claims have been disclaimed or abandoned as the case has progressed, so we need not address them.

The plaintiffs allege the City of Wichita is liable as the employer of Snyder and Brown based on respondeat superior or vicarious liability. They have not asserted any theories of direct liability against the City. All of the bases for liability rest on common-law torts. The plaintiffs have not sought recovery on any ostensible constitutional deprivations or other claims rooted in federal law. The KTCA, therefore, governs all of the claims and guides our review on appeal.

*KTCA Principles*

Broadly considered, the KTCA strips away sovereign immunity and makes government entities and their employees liable for their negligent and otherwise tortious conduct to the same extent as their private sector counterparts, subject to a set of specific statutory immunities. See K.S.A. 75-6103(a). Under the KTCA, municipal liability is, therefore, the rule and immunity the exception. *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, 233, 262 P.3d 336 (2011); *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 364, 819 P.2d 587 (1991).

The KTCA contains an extensive, though nonexclusive, list of immunities. K.S.A. 75-6104. Again, as a general matter, the immunities are to be narrowly construed consistent with the overarching rule of governmental liability. *Jackson v. City of Kansas City*, 235 Kan. 278, 286, 680 P.2d 877 (1984) (KTCA creates a "general rule of governmental liability" subject to exceptions that are to be given a "strict or narrow interpretation."), *overruled on other grounds by Simmons v. Porter*, 298 Kan. 299, 312 P.3d 345 (2013); *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 290, 261 P.3d 943 (2011). A statutory immunity constitutes a legal avoidance of or affirmative defense to liability, so the governmental party asserting an immunity bears the burden of proving

13

its applicability at trial. *Soto v. City of Bonner Springs*, 291 Kan. 73, 78, 238 P.3d 278 (2010); *Jackson*, 235 Kan. at 286. As we have said, on summary judgment, a party relying on an affirmative defense must present uncontroverted facts establishing the defense. See *Golden*, 47 Kan. App. 2d at 497.

*Self-defense Privilege*

A person threatened with physical harm has a right to respond with a display of force or the actual use of force including, in certain circumstances, deadly force. The response, however, must be reasonably calibrated to the apparent harm. See K.S.A. 2018 Supp. 21-5222. This right of self-defense justifies conduct that absent an aggressor's initial threat would itself amount to a criminal or civil wrong, typically a form of assault or battery. The law commonly refers to self-defense as a privilege in the sense that it permits or justifies in particular circumstances intentional conduct that otherwise would be unlawful. See *State v. Andrew*, 301 Kan. 36, 47, 340 P.3d 476 (2014) (noting "'privilege of using force in self-defense'" in context of trespasser in dwelling) (quoting *People v. Toler*, 9 P.3d 341, 353 [Colo. 2000]); Restatement (Second) of Torts §§ 63, 65 (1965); Prosser and Keeton, Law of Torts § 19 (5th ed. 1984) ("The privilege of self-defense rests upon the necessity of permitting a person who is attacked to take reasonable steps to prevent harm.").

Self-defense, then, is an avoidance in a civil action for damages, so the defendant relying on it bears the burden of proof. *Redding v. Shelton's Harley Davidson, Inc.*, 139 N.C. App. 816, 821, 534 S.E.2d 656 (2000) (privilege presents affirmative defense to civil battery on which defendant bears burden of proof); Prosser and Keeton, Law of Torts § 16 (5th ed. 1984) (defendant must "plead and prove" privilege or justification excusing conduct otherwise amounting to intentional tort); 6A C.J.S., Assault § 49 (defendant bears burden of proving privilege or justification of self-defense as affirmative defense to battery). The Kansas pattern jury instructions treat self-defense as an

14

affirmative defense that the defendant must prove at trial. See PIK Civ. 4th 106.01 (burden of proof for affirmative defenses); PIK Civ. 4th 127.04 Notes on Use (instruction on self-defense should be given with PIK Civ. 4th 106.01 on burden of proof for affirmative defenses).

The Kansas Legislature has codified self-defense. K.S.A. 2018 Supp. 21-5221 et seq. Although cataloged among the principles of criminal liability, those statutes also govern self-defense as a privilege against liability for intentional torts, such as assault and battery. See K.S.A. 2018 Supp. 21-5231(a) (statutory self-defense provides immunity to civil actions based on that use of force). Under K.S.A. 2018 Supp. 21-5222(b), a person has a right to use "deadly force" to defend himself or herself against the infliction of "imminent death or great bodily harm." Deadly force as a means of self-defense is that degree of force "likely to cause death or great bodily harm" to the aggressor and necessarily permits the use of handguns, knives, or other lethal weapons. K.S.A. 2018 Supp. 21-5221(a)(2). In the face of a threat of less than death or great bodily harm, a person may defend himself or herself with what might be characterized as ordinary force. That degree of permissible force entails threats to use force, including deadly force; "display" of a weapon or other "means of force"; and "the application of" less than deadly force. See K.S.A. 2018 Supp. 21-5221(a).

To act in self-defense, a person must "reasonably believe" both a physical threat exists and the degree of force he or she uses in response to be necessary under the circumstances. K.S.A. 2018 Supp. 21-5222. The required statutory belief has subjective and objective components, meaning, first, the person must honestly believe he or she is in immediate danger necessitating the use of that degree of force against an aggressor (subjective component) and, second, an objectively reasonable person would also view the circumstances that way (objective component). See *Andrew*, 301 Kan. at 45.

The statutorily codified self-defense privilege applies to law enforcement officers acting within the scope and course of their employment. But the self-defense privilege is distinct from the immunities extended to government agents under the KTCA and is equally available to private parties. As we discuss, if a government agent's intentional threat or use of force cannot be justified as self-defense, KTCA immunities may be unavailable to shield that conduct.

*Negligence Claims Based on Conduct Before Randolph Leaves House*

Randolph's estate and the family members at the residence make parallel negligence claims based on how Snyder and Brown acted leading up to Snyder's use of his Taser and pistol. Basically, they claim Snyder mismanaged the family's request for help with Randolph, leading directly to the fatal shooting. And they fault Brown for failing to intervene in light of Snyder's flawed approach. The claims are legally of a kind and may be addressed together.

Actionable negligence first requires that the alleged wrongdoer owe a legally recognized duty of due care to the injured party, and the wrongdoer must then breach that duty in a way causing the injury. *Estate of Belden*, 46 Kan. App. 2d 247, Syl. ¶ 7. Lack of due care typically entails doing something a reasonable person would not do under the circumstances or failing to do something a reasonable person would do. *Elstun v. Spangles, Inc.*, 289 Kan. 754, 756, 217 P.3d 450 (2009). So a defendant's affirmative conduct or inaction may be negligent depending on the circumstances. Whether a duty exists presents a question of law. *Adams*, 289 Kan. 577, Syl. ¶ 4. Breach of a lawful duty and the causal connection between a breach and the claimed injury are questions of fact. *Calwell v. Hassan*, 260 Kan. 769, Syl. ¶ 3, 925 P.2d 422 (1996); *Estate of Belden*, 46 Kan. App. 2d 247, Syl. ¶ 13.

Snyder, Brown, and the City have interposed various defenses and immunities under the KTCA to those negligence claims. We need not explore all of them because we find the discretionary function immunity in K.S.A. 75-6104(e) to be legally sufficient to support the district court's summary judgment on those claims. We have described the immunity this way:

"Discretionary function immunity under the KTCA comes into play when a government actor makes a choice among policy options in addressing a given set of circumstances. *Kansas State Bank & Tr. Co.*, 249 Kan. at 365 ('[A] discretionary function must involve some element of policy formulation.'). But discretionary function immunity does not protect a decision simply because it entails a selection between taking an action and refusing to take that action. If that were true, discretionary function immunity would eliminate governmental tort liability, since virtually every decision to act or to refrain from acting involves some degree of choice. 249 Kan. at 365. ('[T]he mere exercise of some judgment cannot be the test for a discretionary function because judgment is exercised in almost every human endeavor.') (internal quote omitted). Rather, the decision must reflect something more—a course of conduct grounded in legitimate options requiring an exercise of reasonable judgment to select one option over the others. *Hesler v. Osawatomie State Hospital*, 266 Kan. 616, 633, 971 P.2d 1169 (1999)." *Estate of Belden*, 46 Kan. App. 2d at 291-92.

Under K.S.A. 75-6104(e), the protected discretion lies in *the choice* among otherwise reasonable options. So a government agent cannot be successfully sued for selecting one reasonable course of action over other reasonable approaches, although one of the discarded approaches arguably might have been better. And the method of choosing among them or exercising that discretion is shielded, even if the method is largely unstudied, wholly arbitrary, or in the language of the statute otherwise "abused."

The immunity, however, does not protect a government agent's choice of a patently unreasonable or plainly wrongful course of conduct over other options. See *Thomas*, 293 Kan. at 236 (discretionary function immunity does not shield choice among

17

available options that violates legal duty); *Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 322, 757 P.2d 272 (1988) ("The governmental agency cannot properly claim that its challenged action falls within the discretionary function exception where the action taken violated a legal duty."); *Schreiner v. Hodge*, 55 Kan. App. 2d 50, 73, 407 P.3d 264 (2017) (Atcheson, J., concurring in part, dissenting in part) ("A deliberate choice to act in a plainly unlawful way cannot be the sort of decision-making protected by discretionary function immunity."), *rev. granted* 308 Kan. 1595 (2018). Nor does discretionary function immunity shielding the choice of a reasonable option then itself shield the inept or negligent implementation of that option. See *Nero v. Kansas State University*, 253 Kan. 567, 586-88, 861 P.2d 768 (1993).

The Kansas Supreme Court recently reiterated the discretionary function immunity does not extend to "minute" choices government actors may make in performing their duties, especially at a "low level" within the organization. *Williams v. C-U-Out Bail Bonds*, 310 Kan. 775, 798, 450 P.3d 330, 346 (2019). But the Kansas appellate courts have broadly applied discretionary function immunity to insulate decisions law enforcement officers make in the field when responding to specific incidents. See *Woodruff v. City of Ottawa*, 263 Kan. 557, 566-67, 951 P.2d 953 (1997) (Tactical decisions of police officers acting in the field may constitute immunized discretionary functions.); *Robertson v. City of Topeka*, 231 Kan. 358, 362, 644 P.2d 458 (1982).

Here, the plaintiffs fault Snyder for not promptly assessing Randolph's condition or summoning an ambulance. And they condemn both his general attitude and his refusal to call a supervisor to the scene. The evidence, however, shows that Snyder inquired whether Randolph posed an immediate danger to himself or the family members. He expressed concern about the availability of an in-patient facility on a holiday and about forcing Randolph to get treatment if he didn't want to. All of that played out over about 10 minutes.

Although Randolph's family understandably found Snyder's manner of surveying the circumstances and his general comportment to be unhelpful and, as they put it, dismissively indifferent, he appeared to be weighing legitimate competing interests. The family members had genuine concerns about Randolph's well-being. But Randolph also had a right not to be involuntarily committed for evaluation or treatment if he were not dangerous. The extraordinarily tragic turn of events does not, in and of itself, change the legal complexion of Snyder's deliberative conduct beforehand. Neither he nor Brown had made a determinative decision about how to handle the situation when Randolph came through the screen door and into the front yard. Snyder's actions to that point fit within the discretionary function immunity afforded police officers in the field. Snyder may have been brusque or even rude, but he had not engaged in obviously wrongful conduct. See *Thomas*, 293 Kan. at 236; *Estate of Belden*, 46 Kan. App. 2d at 292.

The plaintiffs contend that the police department's Policy 519 addressing responses to calls for assistance involving mentally ill persons undercuts any reliance on the discretionary function immunity. We disagree. If a policy or procedure dictates a precisely defined course of conduct or result, then discretionary function immunity cannot apply for the very reason that the policy or procedure necessarily precludes choosing among options or the exercise of what would be protected discretion. *Thomas*, 293 Kan. at 235 (mandatory policy precluding discretionary function immunity "leaves little to no room for individual decision making, exercise of judgment, or use of skill, and qualifies a defendant's actions as ministerial rather than discretionary"); *Soto v. City of Bonner Springs*, 291 Kan. 73, 80, 238 P.3d 278 (2010). Policy 519 is not of that tenor. To the contrary, the policy outlines general practices that officers "should consider applying" in responding to a mental health call, such as "[r]emain calm," "[p]resent a genuine willingness to understand and help," and "[a]ssess safety issues." The policy also identifies approaches that typically should be avoided. In short, Policy 519 consists of what may be characterized as good or even best practices, but those practices are so generically stated that they likely would be almost universally adaptable to most police

19

contacts with citizens, apart from suspects actively engaged in serious or violent crimes. Moreover, the language of the policy identifies the practices as suggested approaches and not mandatory standards supplanting on-the-scene discretion.

We conclude that discretionary function immunity under K.S.A. 75-6104(e) precludes the negligence claims against Snyder based on his conduct up to the time Randolph came out of the house. Brown must likewise be shielded for his inaction to that point in not intervening more directly in how Snyder handled the situation and dealt with the family members.

Snyder and Brown also contend the public duty doctrine immunized them for their conduct up to the time Randolph came out of the house. The doctrine essentially rests on the idea government agents owe a duty to the general public in performing their jobs competently. But a careless or negligent performance does not breach a duty legally owed any specific person. So someone harmed as the result cannot establish an actionable breach of a duty owed him or her as a necessary element of a cognizable tort claim. See *Williams*, 310 Kan. at 788-89, 450 P.3d at 340 (describing doctrine); *Hopkins v. State*, 237 Kan. 601, 611, 702 P.2d 311 (1985). Because discretionary function immunity is sufficient to support the district court's ruling on those negligence claims, we need not consider the public duty doctrine. See *Keiswetter v. State*, 304 Kan. 362, 373, 373 P.3d 803 (2016).

*Estate's Claims Based on Conduct After Randolph Leaves House*

The estate contends Snyder committed the intentional torts of assault and battery against Randolph in using both his Taser and his pistol. A civil assault entails the threat of bodily harm coupled with the apparent ability to carry out the threat resulting in the victim's immediate apprehension of harm. *Baska v. Scherzer*, 283 Kan. 750, 756, 156 P.3d 617 (2007). The actionable injury is the victim's apprehension and, thus, his or her

20

mental disturbance resulting from the threat. 6 Am. Jur. 2d, Assault and Battery § 88; Prosser and Keeton, Law of Torts § 10 (5th ed. 1984). Civil battery entails an unprivileged intentional touching with the purpose of bringing about a harmful or offensive contact. *Baska*, 283 Kan. at 756. The compensable harm derives from the nature and extent of the contact. Prosser and Keeton, Law of Torts § 9 (5th ed. 1984). The wrongdoer may be held accountable if he or she has the intent to cause a physical injury or an otherwise offensive physical contact. *McElhaney v. Thomas*, 307 Kan. 45, 55-56, 405 P.3d 1214 (2017).

The facts, taken favorably to the plaintiffs, show that Randolph had no appreciation of what was going on around him as he barreled out of the house and walked across the front yard. Consistent with the description of his thousand-yard stare, Randolph did not respond to his family's urgent entreaties to go back inside. Family members characterized Randolph as behaving almost autonomically, replicating his condition weeks earlier when he had been diagnosed as catatonic. Randolph did not visibly recoil or otherwise react when Snyder drew his Taser. Randolph's reaction to being struck with the Taser is open to dispute, as Snyder's own conflicting accounts establish. Finally, Randolph showed no reaction to Snyder drawing and pointing his pistol, although the officer didn't wait any appreciable time before firing.

Based on that rendition of the facts, the estate has failed to present evidence from which reasonable jurors could conclude that Randolph comprehended that Snyder had pointed any weapons at him. Just as Randolph was oblivious to his surroundings and his family, he would have been oblivious to the Taser and the pistol aimed at him. He, therefore, would not have had an apprehension of harm or much of anything else. According to the accounts of family members, Randolph did not flinch or otherwise react when Snyder confronted him with the Taser and then the pistol. The district court properly granted summary judgment on the estate's claims for assault. We do not consider the alternative arguments Snyder has advanced for relief from those claims.

21

The estate has alleged Snyder committed two distinct batteries of Randolph, first by discharging the Taser and then by firing his pistol, inflicting a fatal injury. We initially consider whether either battery can be considered privileged self-defense and then examine how the KTCA immunities might apply. We conclude that disputed issues of material fact preclude summary judgment on these claims.

We suppose without deciding that Snyder's deployment of the Taser amounted to the use of ordinary rather than deadly force for purposes of the self-defense statutes. See K.S.A. 2018 Supp. 21-5221(a) (distinguishing between "use of force" and "use of deadly force"); *State v. Carter*, 55 Kan. App. 2d 511, 519, 419 P.3d 55 (2018) (Taser designed as nonlethal weapon and should not be considered deadly weapon, although use may cause death or serious bodily injury in rare instances), *rev. granted* 309 Kan. 1350 (2019). As we have explained, statutory self-defense requires both a subjective belief and an objective determination that the degree of force used was necessary to fend off an unlawful attack.

Despite the myriad facts the parties submitted on summary judgment and the district court's wholesale acceptance of those facts, none of them appear to address why Snyder deployed his Taser. We are not obligated to comb through the supporting evidentiary materials in search of facts the parties have neither identified in their appellate briefs nor presented in their memoranda to the district court addressing the motion. The facts indicate Snyder did not use the Taser to effect an arrest of Randolph. But that negative inference fails to establish why he did act. As the party relying on self-defense, Snyder had the obligation to come forward with undisputed facts supporting his use of the Taser for self-defense or some other legitimate reason. He has not done so. The void is particularly troublesome with respect to Snyder's subjective belief as to why he used the Taser. Filling that void would require us to draw inferences against the plaintiffs, contrary to the standard for ruling on summary judgment motions. We, therefore, cannot

say for purposes of summary judgment that a reasonable jury would necessarily find Snyder acted in privileged self-defense in tasing Randolph.

The analysis of Snyder's use of his pistol to shoot Randolph as an act of self-defense is more involved. First, of course, discharging the pistol constituted deadly force within the meaning of K.S.A. 2018 Supp. 21-5221(a)(2), and Snyder could do so only to "prevent imminent death or great bodily harm" to himself or someone else. K.S.A. 2018 Supp. 21-5222(b). Again, to support summary judgment, Snyder had to identify evidence establishing that he subjectively believed deadly force was necessary and that an objectively reasonable person in the same situation would hold a like belief.

As we have already explained, the evidence developed in the summary judgment record includes factual disputes bearing on this issue. First, family members characterized Randolph as unresponsive and oblivious as he walked across the yard. His affect was flat rather than aggressive or violent. Snyder described Randolph as far more deliberative and directed in his actions and suggested his comportment was threatening. At this stage, we have to accept the account of the family members. And that version weighs against objective support for the use of deadly force. The family members similarly indicated Randolph had the knife at his side and never brandished it in a threatening manner. In his deposition, Snyder testified inconsistently about his assessment of Randolph as he saw the knife. Without belaboring what we've already discussed, Snyder testified that Randolph raised his hand with the knife in an aggressive way indicative of an imminent attack. But he also testified Randolph may have lifted his hands and arms in an involuntary response to the electric shock from the Taser—a reaction that he wouldn't have viewed as a life-threatening assault. And Snyder acknowledged an earlier recorded statement he gave indicating an attack might be a possibility. Those varied descriptions are sufficiently discordant to call into question Snyder's subjective belief when he shot Randolph, especially as a necessary component of a self-defense privilege.

23

Snyder, therefore, cannot rely on self-defense to warrant summary judgment on the estate's claims for battery. In so ruling, we cannot and do not offer any suggestion about what a fact-finder might decide, since that would depend on credibility determinations we are in no position to make. See *Estate of Belden*, 46 Kan. App. 2d at 280.

In his brief, Snyder offers several legal arguments to bolster his self-defense privilege. We find them unavailing. First, he notes law enforcement officers have the authority to use force, including deadly force in some situations, to effect an arrest or to protect themselves during the course of an arrest. K.S.A. 2018 Supp. 21-5227. But the facts on summary judgment do not show that Snyder sought to arrest Randolph.

Second, he points out that individuals who are attacked need not retreat before acting in self-defense; they may, in the popular phrase, stand their ground. K.S.A. 2018 Supp. 21-5230. The stand-your-ground rule would appear to apply to law enforcement officers invited onto private property to assist with mentally ill persons. But, as we have described, the summary judgment facts taken favorably to the plaintiffs do not establish that Snyder merely stood his ground. Rather, he moved toward Randolph, as if to engage him. Nor do the facts, taken in that light, establish that Randolph was attacking Snyder, so much as just walking in his direction in a deep stupor.

Most prominently, however, Snyder contends we should apply the standard used to assess constitutional torts for a government agent's use of excessive force in violation of the Fourth Amendment to the United States Constitution. A government agent intentionally applying undue force to an individual violates that person's Fourth Amendment right against unreasonable seizures. The victim may bring an action for damages against the individual government actor and, in some circumstances, the government entity under 42 U.S.C. § 1983.

24

A civil action for excessive force violating the Fourth Amendment looks at the degree of force an objectively reasonable law enforcement officer would use in comparable circumstances. The claim does not consider the defendant officer's subjective belief about the appropriate measure of force. *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989); *Cass v. City of Dayton*, 770 F.3d 368, 374-75 (6th Cir. 2014). The standard promotes uniformity across cases and, thus, in the protection of a fundamental constitutional right; that uniformity would be lost if an officer's subjective belief were either a sufficient defense alone or a necessary component of a defense. Cf. *Devenpeck v. Alford*, 543 U.S. 146, 153-54, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004) (law enforcement officer's state of mind irrelevant to constitutional propriety of Fourth Amendment seizure; contrary rule would recognize or reject constitutional violations arising from indistinguishable external factual circumstances based solely on subjective intent). In short, constitutional reasonableness (or unreasonableness) in excessive force cases brought under § 1983 is measured by an objective standard alone.

But that standard for a § 1983 claim based on a Fourth Amendment violation has no direct bearing on a claim for common-law battery under state law. They are two different legal claims or theories of liability, even though they may arise from a shared set of facts. Plaintiffs may pick and choose among possible theories of liability and need not assert every claim legally available to them. If they do not bring a particular claim— say, a constitutional tort under § 1983—in favor of other claims, they forsake any relief specific to that claim. By the same token, however, they cannot be subject to defenses specific to that claim. See *Golden*, 47 Kan. App. 2d at 463-64.

The State, acting through the Legislature, defines the liability of its agents for common-law torts. In years past, Kansas afforded those agents broad tort immunity but changed course with the adoption of the KTCA. And the KTCA now fixes the scope of liability and the concomitant immunities for claims grounded in state law. See

25

*Keiswetter*, 304 Kan. at 366 (establishing government liability and any exceptions or immunities are "matters of public policy left to the legislature"). By generally characterizing the liability of government agents to be comparable to private citizens, the Legislature effectively recognized self-defense, as established in Kansas law, to be a shield to claims for intentional torts, such as assault and battery, made against law enforcement officers. So self-defense as outlined in K.S.A. 2018 Supp. 21-5221 et seq. creates whatever privilege may be extended to Snyder in resisting the estate's claim for common-law battery. The measure of appropriate force in determining a constitutional injury based on a violation of Randolph's Fourth Amendment rights—a theory of liability the estate has never pursued in this case—neither dictates nor shapes the self-defense privilege to the battery claim it has pursued.

Snyder also contends the district court properly granted summary judgment on the estate's claim of battery under four of the specific immunities in K.S.A. 75-6104. We consider each of those immunities.

First, Snyder cites discretionary function immunity. As we have already explained, the immunity covers a choice made among reasonable options in the absence of any policies or procedures mandating a specific course of conduct. So if a government agent selects an appropriate option that nonetheless injures a third party, the decision and any resulting harm to a third party typically would be shielded from tort liability. But the agent's decision to act in a way that is plainly improper or unlawful does not amount to an exercise of protected discretion.

Here, if Snyder shot Randolph in self-defense, the decision would be a legally appropriate choice, though not necessarily the only or best option, and would be immunized as a discretionary function. Conversely, if Snyder were not privileged to shoot in self-defense, the decision to resort to deadly force would be wrongful. And it, therefore, could not be a protected discretionary act. See *Fry v. City of Galena*, 450 F.

26

Supp. 2d 1236, 1247 (D. Kan. 2006). Since we have found disputed issues of material fact as to Snyder's assertion of self-defense, his reliance on discretionary function immunity similarly cannot be resolved on summary judgment. Where, as here, the allegedly tortious conduct entails an intentional act that is either wrongful or privileged, the discretionary function immunity really adds little to the mix. The determination on privilege necessarily drives the outcome.

Snyder also invokes the statutory immunity for a failure to provide or "the method of providing" police or fire protection. K.S.A. 75-6104(n). This provision clearly shields systemic or policy decisions a governmental entity may make, such as where to build a fire station or how to assign patrol officers across a municipality. And it arguably reaches operational or tactical decisions made in the field as law enforcement officers or firefighters respond to particular incidents. To that extent, the immunity effectively parallels or codifies the protections of the public duty doctrine. But those protections do not cover intentional acts that are tortious. *Beck v. Kansas Adult Authority*, 241 Kan. 13, 33, 735 P.2d 222 (1987) (KTCA immunities do not shield wrongful willful acts, i.e., those involving "an intentional act and intentional injury"); *Hopkins v. State*, 237 Kan. 601, 611, 702 P.2d 311 (1985) (immunities in K.S.A. 75-6104 apply to negligent acts or omissions but not to "acts . . . involving more than the lack of ordinary care"); *Caplinger v. Carter*, 9 Kan. App. 2d 287, 295, 676 P.2d 1300 (1984) (KTCA immunities do not shield law enforcement officer's intentional use of otherwise unprivileged force); *Nicol v. Auburn-Washburn USD 437*, 231 F. Supp. 2d 1092, 1106 (D. Kan. 2002) (KTCA immunities do not apply to intentional torts). As the court explained in *Hopkins*, "[a] law enforcement officer who acts maliciously or wantonly . . . acts outside the protection afforded by the [KTCA]." 237 Kan. at 611.

As with discretionary function immunity, Snyder would not be entitled to protection under K.S.A. 75-6104(n) if the shooting of Randolph were unprivileged.

27

Absent self-defense or some other legal justification, deliberately shooting another person four times would be an intentional tort evincing maliciousness or wantonness.

Snyder next says he is entitled to what's known as "adoptive immunity" under K.S.A. 75-6104(i). That subsection extends immunity to "any claim" that is either "limited or barred by any other law" or based on the actions of a government agent or employee who is otherwise immune from suit or damages. So it incorporates or adopts an immunity originating in some other source. By way of example, K.S.A. 75-6104(i) would adopt the immunity in K.S.A. 2018 Supp. 21-5231(a) precluding civil actions against persons for using appropriate force to defend themselves. The self-defense immunity creates a barrier not only against a finding of liability and an adverse judgment but also against having to participate in the litigation process at all. Presumably, the self-defense immunity afforded a government agent would pass through to any affiliated governmental entity under the second clause of K.S.A. 75-6104(i).[2]

[2]The defendants in this case have not expressly asserted the immunity against litigation, and the parties have not discussed its ramifications, including any procedural devices apart from summary judgment that might be used to assert that immunity in a civil action. We need not and do not venture into that area uninvited.

Snyder, however, submits he would be entitled to qualified immunity on an excessive force claim brought under § 1983 for a violation of Randolph's Fourth Amendment rights. And, he says, that immunity should be adopted through K.S.A. 75-6104(i) to cut off liability for the battery claim. We are unpersuaded.

Qualified immunity is a common-law doctrine affording government agents a limited protection against claims for damages resulting from alleged violations of the United States Constitution or other federal law. The immunity applies in § 1983 actions unless the government agents have violated "a federal statutory or constitutional right" and the wrongfulness of their conduct was "'clearly established at the time'" they acted.

28

*District of Columbia v. Wesby*, 583 U.S. ___, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 [2012]). As a matter of public policy, judicial recognition of qualified immunity ostensibly encourages government officials and employees to act vigorously in performing their duties free from a fear they will be heavily burdened by insubstantial or harassing civil suits challenging those actions as violations of federal law. See *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).

We need not venture deep into the thicket of qualified immunity, especially as it has grown up around Fourth Amendment claims, to resolve Snyder's assertion of adoptive immunity. To advance the analysis, we assume more or less arbitrarily that Snyder might, indeed, be entitled to qualified immunity had the estate brought a § 1983 claim based on a violation of Randolph's Fourth Amendment rights. As we have already explained, the estate has not, and, in turn, the law applicable to that constitutional wrong has no particular legal significance in resolving the state law tort claim for battery.

The KTCA's adoptive immunity provision similarly does not incorporate qualified immunity. The statutory language confines the adopted immunities to those that would apply to the claims actually asserted against the governmental entity or agent. Not to belabor the point, a § 1983 claim for a constitutional wrong is not the same as a state tort claim for battery, even if they are based on the same incident. The elements of liability and the available remedies differ significantly. The Legislature did not intend to allow a government entity or agent to rely on some immunity having no direct application to the claims actually being litigated. To construe K.S.A. 75-6104(i) in the manner Snyder promotes, we would have to give the statutory language, particularly the phrase "any claim," an expansive interpretation also incorporating immunities to other factually or legally similar claims. That expansion would conflict with the narrow reading to be given the immunities as exceptions to the general rule of liability under the KTCA. Moreover, it would impermissibly add a substantive legal concept not readily found in the statutory

29

language. *Robinson v. City of Wichita Employees' Retirement Bd. of Trustees*, 291 Kan. 266, Syl. ¶ 6, 241 P.3d 15 (2010) (The court "will not speculate on legislative intent and will not read the [statutory] provision to add something not readily found in it."); *Unruh v. Purina Mills*, 289 Kan. 1185, 1201, 221 P.3d 1130 (2009) (rejecting an argument that "asks the court to read into the statute language that is not present").

Until now, the Kansas appellate courts have not considered whether qualified immunity could be applied to state tort claims under K.S.A. 75-6104(i). Federal District Court Judge John W. Lungstrum examined the question and, for essentially the same reasons we have outlined, concluded qualified immunity should not be adopted through K.S.A. 75-6104(i) to bar various state law tort claims. *Gilliam v. U.S.D. No. 244 School Dist.*, 397 F. Supp. 2d 1282, 1289-91 (D. Kan. 2005). Before *Gilliam*, several federal district court cases construed adoptive immunity under K.S.A. 75-6104(i) as incorporating qualified immunity. *Arceo v. City of Junction City, Kansas*, 182 F. Supp. 2d 1062, 1094 (D. Kan. 2002); *Estate of Fuentes ex rel. Fuentes v. Thomas*, 107 F. Supp. 2d 1288, 1305 (D. Kan. 2000); *Grauerholz v. Adcock*, No. 00-1520-JTM, 2002 WL 226405, at *6 (D. Kan. 2002) (unpublished opinion). None of them, however, articulated any explanation for that result. In their collective silence, they are something less than compelling.

Finally, Snyder makes a brief generic argument under K.S.A. 75-6104(d) that immunizes the adoption or enforcement or the failure to adopt or enforce "any written personnel policy which protects persons' health or safety." The statute also states any such policy does not itself create a legally enforceable duty owed the persons protected. As we understand the argument, Snyder says the estate (and Randolph's family members) cannot rely on Policy 519 covering responses to mental health calls or the police department's use of force policy to establish any legal duty on his part. We don't see that this argument alters the legal landscape. As we have explained, Policy 519 consists of general recommendations that lack sufficient specificity to create legal duties. The

30

department's use of force policy, at least as it may pertain here, tracks the self-defense principles codified in K.S.A. 2018 Supp. 21-5221 et seq. and is, therefore, no more restrictive in defining how officers may defend themselves in the field. So Snyder's argument doesn't advance an independent basis for summary judgment.

In sum, we conclude the district court erred in granting summary judgment on the estate's claim for civil battery against Snyder.

The estate brought a claim of negligent use of force against Snyder for deploying his Taser and firing his pistol at Randolph. Snyder has countered that Kansas does not recognize a cause of action for negligent use of force and, even if the state did, the undisputed facts would not support liability. We are disposed to conclude such a claim likely exists under Kansas law but not on these facts.

Upon a cursory look, negligent use of force seems to be a strange tort, since the application of force typically entails an intentional act and, thus, seems at odds with a claim grounded in careless or inadvertent conduct. But, as with much in the law, looks can be deceiving, and first impressions often yield to the nuance of more studied review. Some unusual scenarios involving law enforcement officers suggest an analytical basis for the claim. Given our resolution of the issue, however, we do not dwell on those possibilities.[3]

[3] A couple of examples grow out of Kansas cases:

A law enforcement officer uses force to arrest a resisting suspect on a misdemeanor charge by applying a jujitsu throw that leaves the arrestee with permanent physical injuries not normally associated with the martial arts maneuver. See *Dauffenbach v. City of Wichita*, 233 Kan. 1028, 667 P.2d 380 (1983). In that situation, an officer would be privileged to use some force to make a misdemeanor arrest. But force resulting in great bodily harm to or the death of the arrestee might not be privileged. Although the officer in the hypothetical intended to use force, he did not intentionally apply force he believed would cause serious injury to the arrestee. The degree of force to

31

effect an arrest involves a different calculus than force used in self-defense. So the example isn't directly analogous to this case.

A law enforcement officer in a patrol car pursues a suspected felon fleeing on foot down a street. The officer tries to keep pace with the suspect and to herd the suspect into an open field where officers on foot might more easily apprehend him. Although the officer disclaims any intent to hit the suspect, the patrol car strikes the suspect and injures him. See *Clark v. Thomas*, 505 F. Supp. 2d 884, 891 (D. Kan. 2007) (factually similar incident). In that hypothetical, the officer lacked the requisite intent to commit a civil battery but arguably engaged in a reckless course of conduct injuring the suspect through physical contact. Here, Snyder intentionally used force, materially distinguishing the example.

Several federal district court judges have indicated Kansas would recognize a claim for negligent use of force and have declined to dismiss those claims as legally unfounded. See, e.g., *Richard v. City of Wichita*, No. 15-1279-EFM-KGG, 2016 WL 5341756, at *8 (D. Kan. 2016) (unpublished opinion); *Patterson v. City of Wichita*, No. 12-CV-1308-JAR, 2014 WL 2533180, at *7-8 (D. Kan. 2014) (unpublished opinion); *Price v. City of Wichita*, No. 12-1432-CM, 2013 WL 6081103, at *4 (D. Kan. 2013) (unpublished opinion). But the Kansas appellate courts have never directly addressed the point. See *Tichenor v. City of Topeka*, No. 106,384, 2012 WL 3136219, at *5-6 (Kan. App. 2012) (unpublished opinion) (court affirms jury verdict for City on negligent use of force claim without considering whether Kansas actually recognizes such a tort); *Grauerholz v. Adcock*, 51 Fed. Appx. 298, 301 n.3 (10th Cir. 2002) (unpublished opinion) (court declines to determine whether Kansas has recognized or would recognize claim for negligent use of force); *Richard*, 2016 WL 5341756, at *8 (noting "the law is somewhat unclear"). Although *Dauffenbach v. City of Wichita*, 233 Kan. 1028, 667 P.2d 380 (1983), was decided under pre-KTCA law, the case lends support for the claim. Without any real discussion, the court allowed the plaintiff to proceed on a negligence theory when a police officer used a martial arts throw to arrest him for a misdemeanor— resulting in catastrophic, if unanticipated, injuries. The KTCA would not undercut the claim as a matter of law. But if the claim were otherwise recognized, the factual circumstances of a given case could trigger one or more immunities in K.S.A. 75-6104.

Snyder argues that negligent use of force claims are categorically "disguised" battery claims and should be treated that way. He says plaintiffs often unsheathe negligence theories because they have failed to file their damage actions until after the one-year statute of limitations for civil battery has run. See K.S.A. 60-514(b). That's not true here; the plaintiffs timely filed their battery claims. Snyder has cited no authority supporting the ironclad rule he describes.

Courts in other jurisdictions have carefully studied the interplay between negligent use of force claims and civil battery claims. See *Ryan v. Napier*, 245 Ariz. 54, 59-62, 425 P.3d 230 (2018); *District of Columbia v. Chinn*, 839 A.2d 701, 710-12 (D.C. 2003). The *Chenn* court drew a distinction between claims for battery, as an intentional tort, and for negligence arising from the same incident. If the plaintiff alleges harm resulting from a law enforcement officer's intentional application of the force, the claim is for battery, and liability turns on whether the action was privileged. Conversely, a negligence claim might lie should an officer breach a recognized standard of care or misperceive a critical fact *before* determining to use force against the plaintiff. 839 A.2d at 710-11. The Arizona Supreme Court more recently took a similar view in *Ryan*, holding a plaintiff "cannot assert a negligence claim based solely on an officer's intentional use of physical force." 245 Ariz. at 57. The court, however, recognized a plaintiff could pursue a negligence claim based on officer conduct "independent of the intentional use of force" or could plead battery and negligence in the alternative if differing factual accounts of the material events supported one or the other. 245 Ariz. at 62. Those approaches don't entirely mesh with the suggestion of negligent use of force wafting through *Dauffenbach*. And statutes, necessarily unique to a particular jurisdiction, create some of the legal duties imposed on law enforcement officers, thereby shaping the application of negligence principles. But those cases are instructive in the absence of more focused authority from the Kansas appellate courts.

We, therefore, presume in *some* circumstances a person might be able to bring a negligence claim under Kansas law arising out of an incident involving a law enforcement officer's physical contact with that person, resulting in an injury. By the same token, we do not intend to define the contours of those circumstances in this case. Snyder's use of force, particularly the fatal shooting of Randolph, virtually defines a civil battery if not otherwise privileged. Snyder deliberately fired four shots at Randolph's torso—an intentional application of deadly force. The shooting was not the product of negligence or carelessness, and Snyder understood the likely consequence of his conduct was a grave or fatal injury to Randolph. Liability, therefore, turns on Snyder's entitlement to a self-defense privilege. The shooting was either a privileged use of force or it was an actionable battery. The same analysis and result controls Snyder's use of the Taser whether the estate treats it as a distinct claim for negligent use of force or as a component of a single claim combined with the shooting.

In short, a claim for negligent use of force does not lie based on any version of the immediate encounter as Randolph emerged from his house and began to move across the front yard. The district court, therefore, reached the correct result in granting summary judgment on the estate's claim for the negligent use of force.

The estate has brought what it characterizes as a wrongful death claim as if it were a distinct legal basis for imposing liability on the defendants. We see the claim more properly treated as conflating the procedural mechanisms for recovering damages based on otherwise actionable injuries done to Randolph that survive his death and for damages his heirs and estate may recover if his death resulted from a third party's wrongful conduct. See K.S.A. 60-1801 (recognizing claims for personal injury survive death of victim); K.S.A. 2018 Supp. 60-1901(a) (recognizing wrongful death claim); K.S.A. 60-1902 (claim for damages to heirs). Because we have found disputed issues of material fact precluding summary judgment for Snyder on the estate's claim for a civil battery causing Randolph's death, any damages for injuries surviving Randolph's death and for

34

harm to his heirs as a result of his death remain in play. We have found the district court otherwise properly granted summary judgment on the claims against Brown. He cannot be kept in the case on this claim, since it requires an independent ground of liability. On summary judgment, the parties have not addressed what, if any, damages for injuries to Randolph survived his death or the damages that might be due his heirs. We do not delve into those issues. Nor do we concern ourselves with real-party-in-interest questions, since both Randolph's estate and a representative of his heirs are plaintiffs. See K.S.A. 60-1902 (heir may bring wrongful death action).

*Family Members' Claims Based on Conduct After Randolph Leaves House*

Alford-Allen has lodged a civil assault claim against Snyder because he pointed his pistol at her when she approached Randolph as he lay on the ground after the shooting. Snyder ordered her back, and she complied. For summary judgment purposes, the parties do not dispute that Snyder's conduct satisfied the elements of an assault: pointing the weapon at Alford-Allen entailed a threat of bodily harm coupled with the ability to carry out the threat, resulting in her immediate apprehension of such harm. The controlling question is whether Snyder's action was privileged and, thus, presents an issue comparable to the estate's claim for battery based on the shooting.

The undisputed facts do not include any explanation from Snyder about why he pointed his pistol at Alford-Allen. A reasonable inference might be that Snyder anticipated an emotionally distraught mother might pick up the knife next to her son's body and menace him or Brown with it. But that simply would be one among many inferences. On summary judgment, we may not draw inferences favoring the moving party, particularly on issues on which that party would bear the burden of proof at trial. So we cannot conclude Snyder's action amounted to privileged self-defense.

35

On appeal, Snyder submits that summary judgment was appropriate because an objectively reasonable officer would have acted in self-defense under the circumstances. As we have already explained, objective reasonableness alone is an adequate ground to turn aside a § 1983 claim based on an ostensible violation of the Fourth Amendment. But objective reasonableness is not a sufficient condition to defeat a claim based on a common-law intentional tort; it must be combined with a subjective intent to act in self-defense to establish a lawful privilege. The record is devoid of evidence of Snyder's subjective intent.

Snyder also submits his decision to point his pistol at Alford-Allen should be accorded discretionary function immunity under K.S.A. 75-6104(e). But that defense also fails on the summary judgment record, since Snyder has not shown his intentional—and otherwise tortious—conduct directed at Alford-Allen was privileged. A law enforcement officer is not shielded by discretionary function immunity for committing an intentional tort, such as assault or battery. The district court erred in entering summary judgment for Snyder on Alford-Allen's assault claim.

The family members, including Alford-Allen, present at Randolph's home at the time of the shooting have collectively pursued various claims that we now take up.

The family members say Snyder committed an assault against each of them when he drew and deployed his Taser and then drew and fired his pistol at Randolph. At the outset, all of those claims depend upon transferred intent or liability in the sense that Snyder did not direct his actions at or particularly intend to affect anyone other than Randolph. The law governing intentional torts incorporates that sort of transference so that a person intending to commit an assault or battery against one individual may be liable if he or she actually causes actionable harm to someone other than the intended victim. *Baska*, 283 Kan. at 757-78 (recognizing that transferred intent applies to intentional torts of assault and battery); *Alteiri v. Colasso*, 168 Conn. 329, 334-35, 362

A.2d 798 (1975) (acknowledging transferred intent applicable to civil assault); *Hensley v. Suttles*, 167 F. Supp. 3d 753, 764 (W.D. N.C. 2016) (under North Carolina law, transferred intent applies to civil assaults); Restatement (Third) of Torts:  Intentional Torts to Persons § 110(a) (Tentative Draft No. 1) (2015) ("For purposes of liability for . . . assault . . . the intent requirement for the tort is satisfied if the actor intends to cause that relevant tortious consequence to a third party, rather than to the plaintiff, but the actor's conduct causes that consequence to the plaintiff.").

With those principles in mind, we look at Snyder's use of the Taser as a separate act from his brandishing and firing of the pistol, although they occurred in rapid succession. The Taser is designed to be nonlethal, as we have noted, and we presume it is commonly viewed as a comparatively benign alternative to the deadly force of firearms. A person, nonetheless, could commit a civil assault by pointing a Taser at someone, since the device delivers a temporarily debilitating electric shock—more than sufficient bodily harm to support the tort. But a Taser has a range limited by the length of the electrical wires used to deliver the shock. None of the family members, therefore, could have been placed in realistic apprehension of personal harm from Snyder's display or use of the Taser. Moreover, he discharged the Taser once at Randolph and immediately discarded it, negating the possibility of some further assault.

Snyder's use of the pistol, however, is a different matter. A firearm is a deadly weapon, and even a handgun has sufficient range to endanger bystanders at some distance. So displaying a handgun coupled with an apparent ability or willingness to use it supports a civil assault of those persons at whom the display has been directed, so long as they perceive those circumstances. Given the nature of the weapon, other persons in what might be characterized as a zone of threat or danger similarly may be placed in immediate apprehension of harm. The individual with the handgun might fire indiscriminately or with less than fine aim. Or he or she might intend to shoot multiple victims. Those possibilities necessarily tend to create an apprehension of harm in persons

other than the specific target at whom the handgun has been pointed. The facts, as presented on summary judgment, placed all of the family members in that zone when Snyder drew his pistol, pointed it at Randolph, and began shooting. We recognize that Snyder's actions in doing so took just seconds. But an actionable civil assault does not require any particular or prolonged duration of either the apparent threat or the apprehension of harm.

We again come to the issue of privilege. If Snyder's use of the firearm were privileged self-defense, that would absolve him of liability not only to Randolph but to anyone claiming through a transferred intent theory. In other words, the privilege insulates the intentional conduct and, thus, precludes liability as to any potential victim of what would otherwise be a civil assault. Because disputed material facts preclude a finding as a matter of law that Snyder acted in self-defense, the district court erred in granting summary judgment on the family members' assault claims based on the shooting of Randolph.

The family members next contend Snyder may be held accountable for the intentional infliction of emotional distress on them as a result of his conduct, principally the shooting of Randolph. A claim for the intentional infliction of emotional distress or the tort of outrage requires: (1) the defendant act intentionally or in reckless disregard of the plaintiff; (2) the actions must be "extreme and outrageous"; (3) the plaintiff has to experience "extreme and severe" mental distress; and (4) the plaintiff's mental distress has to be causally connected to the defendant's actions. *Valadez v. Emmis Communications*, 290 Kan. 472, Syl. ¶ 1, 229 P.3d 389 (2010). On summary judgment, Snyder has challenged the claim only on the ground his conduct was not extreme and outrageous. So we consider only that element. Based on our review of the evidence and the law thus far, we may quickly dispose of the point.

The wrongdoer need not intend to cause the victim emotional distress. Rather, the tort requires that the intentional conduct so far exceed societal norms that it may be fairly characterized as exceptionally vile or reprehensible or utterly intolerable. Nearly 45 years ago, the Kansas Supreme Court borrowed a colorful caliper that asks whether the facts would cause "'an average member of the community'" to recoil in resentment at the defendant's conduct and "'exclaim, "Outrageous!"'" *Dotson v. McLaughlin*, 216 Kan. 201, 210, 531 P.2d 1 (1975) (quoting Restatement [Second] of Torts § 46, comment d [1965]). That measure of the tort endures. See *Strano v. Azzinaro*, 188 Conn. App. 183, 188, 204 A.3d 705 (2019); *F.B.C. v. MDwise, Inc.*, 122 N.E.3d 834, 837 (Ind. App. 2019); *McIlrath v. City of Kingman*, No. 109,837, 2014 WL 1887652, at *5 (Kan. App. 2014) (unpublished opinion).

Given the disputed issues of material fact, we must assume Snyder did not act in privileged self-defense when he shot Randolph. And that assumption guides our consideration of the plaintiffs' claim for the intentional infliction of emotional distress. We need not burden our determination with an extended description of the circumstances. The intentional and unprivileged action of a law enforcement officer in firing four shots into a person's chest in full view of that person's family members would satisfy any acceptable definition of extreme and outrageous. In that respect, we don't have to say any more. The district court erred in granting summary judgment on this claim.

We need not and do not extract and examine individually other aspects of Snyder's conduct to determine if each alone might be considered extreme or outrageous. Nor do we specifically assess the cumulative impact of his conduct, although the shooting should not be untethered from everything else that happened at Randolph's home on July 4th. Nothing in those events would appreciably mitigate the shooting if it were otherwise unprivileged and, thus, a battery.

Finally, the family members contend Snyder negligently caused them emotional distress through his actions, particularly, of course, the shooting of Randolph. The Kansas Supreme Court has permitted individuals to recover emotional distress damages on a negligence theory only if they have also suffered near contemporaneous physical harm distinct from common physical symptoms of the claimed emotional distress, such as insomnia or hypervigilance. *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, Syl. ¶ 1, 662 P.2d 1214 (1983); *Majors v. Hillebrand*, 51 Kan. App. 2d 625, 628, 349 P.3d 1283 (2015) (recognizing continued viability of physical injury limitation on claims for negligent infliction of emotional distress). In explaining the nature of the claim, the *Hoard* court cited *Whitsel v. Watts*, 98 Kan. 508, 159 P. 401 (1916), as a situation in which damages would be permitted:  The defendant made "angry threats" to a pregnant woman who retreated into her house, collapsed, and miscarried several hours later. *Hoard*, 233 Kan. at 276. Plaintiffs have not offered evidence of that kind of near contemporaneous physical harm to support their claims. The district court properly granted summary judgment on the claims for negligent infliction of emotional distress.[4]

[4]In *Hoard*, the court mentioned an exception to the physical injury rule when the defendant's conduct is "willful or wanton" or undertaken "with intent to injure." 233 Kan. at 274. The exception, however, does not expand the tort of negligent infliction of emotional distress. Rather, it suggests intentional infliction of emotional distress as the legally appropriate claim, consistent with the court's citation to *Lantz v. City of Lawrence*, 232 Kan. 492, 500, 657 P.2d 539 (1983). The cited passage of *Lantz* specifically refers to the intentional infliction of emotional distress, which requires no physical injury. 232 Kan. at 500.

*City of Wichita's Liability*

The City has not asserted any theories of defense independent of those Brown and Snyder have presented. Since the City's liability is based on its status as the employer of the officers and no one has suggested the officers acted outside the scope and course of

their duties, the City remains a defendant on those claims we have found the district court improperly dismissed on summary judgment.

*Conclusion*

Having thoroughly reviewed the summary judgment submissions to the district court, the district court's journal entry, and the arguments of the parties on appeal, we affirm the district court in part, reverse in part, and remand for further proceedings.

We affirm summary judgment on:

The plaintiffs' claims against Brown;

The plaintiffs' negligence claims against Snyder based on his conduct until the time Randolph left the house;

The estate's claims for assault against Snyder based on his display of the Taser and the pistol at Randolph;

The estate's claims against Snyder for the negligent use of force;

The family members' claims against Snyder for assault based on his use of the Taser; and

The family members' claims against Snyder for the negligent infliction of emotional distress for the death of Randolph.

We reverse summary judgment and remand for further proceedings on:

41

The estate's claim against Snyder for battery based on his use of the Taser against Randolph;

The estate's claim against Snyder for battery based on his shooting of Randolph, including what has been denominated as the wrongful death claim that appears to include both survival claims of Randolph and claims of Randolph's heirs as a result of his death;

Alford-Allen's claim of assault against Snyder for pointing his pistol at her as she approached Randolph after the shooting;

The family members' claims for assault against Snyder based on his use of the pistol; and

The family members' claims against Snyder for the intentional infliction of emotional distress based on the death of Randolph.

Affirmed in part, reversed in part, and remanded for further proceedings.