NOT DESIGNATED FOR PUBLICATION

No. 122,441

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PATRICIA E. SINCLAIR,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; PAULA B. MARTIN, judge. Opinion filed February 18, 2022. Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Jon Simpson*, assistant district attorney, *Suzanne Valdez*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., ATCHESON, J., and RICHARD B. WALKER, S.J.

PER CURIAM:  A jury convicted Patricia E. Sinclair of aggravated battery, and she was sentenced to 24 months' probation from a controlling prison term of 24 months. On appeal, she raises eight issues, which fall into four categories:  (1) the district court's aggravated battery and burden of proof instructions and its failure to instruct on defense of an occupied vehicle were clear error; (2) the prosecutor erred by misstating the law twice and diluting the burden of proof; (3) cumulative error deprived Sinclair of a fair trial; and (4) the district court erred by not submitting Sinclair's prior convictions to a jury to determine her criminal history.

Although we find the district court erred when instructing the jury, we conclude the error does not require reversal. Although the prosecutor briefly misstated the law once, we find the error to be harmless. We likewise hold that cumulative error did not deprive Sinclair of a fair trial, and the district court did not err when calculating Sinclair's criminal history.

FACTS

In October 2016, a fire forced Sinclair to move out of her Lawrence house. By mid-March 2017, she was living in her car. In the evenings, she parked on the street outside her former house because of her familiarity with the neighborhood. This concerned Brad Hoopes, one of Sinclair's former neighbors. Because he believed the house fire was not accidental, Hoopes felt Sinclair posed a danger to the neighborhood.

On the evening of March 20, 2017, Sinclair once again parked on the street near her former residence. Hoopes, who had been drinking at dinner, noticed the car around 8:45 p.m. and went to the car. According to Hoopes, he approached the driver-side door, saw Sinclair reclined in the driver's seat, and began knocking on Sinclair's window and yelling, "'Why are you still here? What are you doing here?'" Sinclair opened the car door and got out holding a hammer. As Hoopes began backing up, Sinclair swung the hammer, knocking off Hoopes' glasses and hitting his left wrist. Hoopes said she hit him on the back with the hammer several more times as he screamed and searched on the ground for his glasses.

Sinclair's recollection differed significantly from Hoopes' version. According to her, she woke up to someone standing by the front passenger door pounding loudly and hard on the window. Afraid the person might break the window, leaving her no safe place to live, Sinclair reflexively grabbed a hammer, opened the driver's door, and tried to get away. In her version, Hoopes came around the car aggressively, grabbed her by the

2

shoulder, and threw her to the ground. Sinclair explained that she did her best to defend herself, but she denied attacking Hoopes and could not recall hitting him with the hammer. After the altercation, Sinclair got back in her car and locked the doors.

A neighbor, Melissa Warren, also witnessed the altercation. She recounted seeing and hearing Hoopes shouting and loudly banging or knocking on Sinclair's passenger window. Warren said Sinclair got out of the driver's seat and walked to the back of the car, where she met Hoopes, and both started yelling. Sinclair then raised what Warren believed was a hammer, and Hoopes fell to the ground and began yelling about his glasses. Eventually, Hoopes and Sinclair began struggling on the ground in the middle of the street. Warren's friend called police.

Police arrived shortly after the altercation and separately interviewed Hoopes and Sinclair. Although Hoopes was very distressed during his initial interview and had trouble remembering details, he explained that Sinclair hit him with a hammer. He also stated that both car doors were open, though he later explained that must have occurred earlier, and that Sinclair attacked him with a hammer earlier that day. Hoopes also made several comments to police, such as, "She's going down tonight. This shit has got to end," and "She finally did the thing that she needed to do." After becoming frustrated, Hoopes said, "We have done every single thing that we can think to try and actually get her arrested. Every single possible thing. She finally did the thing where she attacked me with a hammer and . . . nothing's gonna happen, so, great."

Officers later talked to Hoopes on his porch, and at that point he explained more calmly what had occurred. At the scene, police took pictures of Hoopes' face, glasses, and wrist. Police came back the next day and took pictures of the bruises on his back.

Officers also attempted to interview Sinclair, but at first she would not come out of her locked car. She eventually cracked one of her windows and explained that she

3

confronted Hoopes with a hammer after he knocked on her window, waking her up and frightening her, but she denied hitting Hoopes. Police eventually removed Sinclair from the car, arrested her, and placed her in a patrol car. While under arrest, Sinclair stated that she should have killed Hoopes and should have made sure his glasses were broken. She later added that she should have murdered Hoopes and broken his hand.

The State charged Sinclair with one count of aggravated battery under K.S.A. 2016 Supp. 21-5413(b)(1)(C), which it charged under two different theories. The district court denied her motion for immunity based on self-defense, and a jury trial was held in April 2019. Following the presentation of evidence, Sinclair did not object to the proposed jury instructions, and the district court instructed the jury on the burden of proof, the elements of aggravated battery, and defense of a person. The parties spent most of their closing arguments discussing whether Sinclair acted in self-defense of her person.

During deliberations, the jury requested the legal definition of "retreat" as used in the self-defense instruction. The district court instructed the jury to use the term's ordinary meaning. The jury ultimately found Sinclair guilty of aggravated battery. The court imposed 24 months' probation with an underlying 24-month prison sentence.

ANALYSIS

On appeal, Sinclair raises four categories of issues:

1. Three alleged jury instruction errors, including omitting an element, failing to give an unrequested affirmative defense, and failing to instruct on the State's burden of proof regarding affirmative defenses;
2. three alleged instances of prosecutorial error, one she contends diluted the State's burden of proof and two she believes misstated the law;
3. cumulative error; and

4

4. a violation of section 5 of the Kansas Constitution Bill of Rights by not submitting her prior convictions to the jury to determine her criminal history for sentencing purposes.

We will discuss each of Sinclair's contentions in turn.

*Jury Instructions*

Sinclair first argues the district court committed clear error by providing inaccurate instructions on the elements of aggravated battery, by failing to provide an unrequested instruction on defense of an occupied vehicle, and by not explicitly stating the State's burden of disproving her self-defense claim. After a careful review of the record, we find the elements instruction was error, but not clear error. An instruction on defense of an occupied vehicle may have been factually appropriate, but any error was not clear error. And the court accurately stated the law on the State's burden of proof.

Appellate courts analyze challenges to jury instructions in three steps. This entails a review for (1) preservation, (2) error, and (3) reversibility. See *State v. Randle*, 311 Kan. 468, Syl. ¶ 1, 462 P.3d 624 (2020). Under the first step, failure to request or object to an instruction does not preclude appellate review, though it does impact the reversibility standard. See K.S.A. 2020 Supp. 22-3414(3) (permitting review of unpreserved jury instruction challenges for clear error); *State v. Chavez*, 310 Kan. 421, Syl. ¶ 4, 447 P.3d 364 (2019) (unrequested jury instruction reviewed for clear error).

Under the second step, an instruction must be both legally and factually appropriate. *Randle*, 311 Kan. 468, Syl. ¶ 1. An instruction is proper if supported by the case's facts and accurately states the applicable law. See K.S.A. 2020 Supp. 21-5108(c) (defendant is entitled to every affirmative defense supported by competent evidence); *State v. Broxton*, 311 Kan. 357, 361, 461 P.3d 54 (2020). And under the third step, clear

5

error requires reversal when an appellate court is firmly convinced the error affected the verdict. See *Chavez*, 310 Kan. at 430. We review the error and reversibility prongs de novo. *Randle*, 311 Kan. 468, Syl. ¶ 1; *Chavez*, 310 Kan. 421, Syl. ¶ 4.

Sinclair agrees she did not object to the jury instructions she now challenges. Thus, any errors in instructing the jury are reviewed under the clear error standard.

1. *The Aggravated Battery Instruction*

Sinclair argues the district court's aggravated battery instruction was legally inappropriate because it misstated the law. Noting that aggravated battery requires proof of physical contact performed in a rude, insulting, or angry manner, she asserts the court committed clear error by omitting the rude manner requirement from one of the charged theories. Although the court's instruction was error, we find it was not clear error.

Sinclair was charged with aggravated battery under K.S.A. 2020 Supp. 21-5413(b)(1)(C). That subsection prohibits:

"knowingly causing physical contact with another person when done in a rude, insulting or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2020 Supp. 21-5413(b)(1)(C).

The district court's instruction to the jury on the elements which the State had to prove read:

"Instruction No. 9
"The defendant is charged with the crime of aggravated battery. The defendant pleads not guilty.
"To establish this charge, each of the following claims must be proved:

"1. That the defendant knowingly caused physical contact to Bradford J. Hoopes in a rude, insulting or angry manner with a deadly weapon, a hammer, and

"2. That this act occurred on or about the 20th day of March, 2017, in Douglas County, Kansas.

"OR

"1. The defendant knowingly caused physical contact with Bradford J. Hoopes in any manner whereby great bodily harm, disfigurement or death can be inflicted.

"2. This act occurred on or about the 20th day of March, 2017, in Douglas County, Kansas.

"A 'deadly weapon' is an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury."

Because the State asserted two separate theories of aggravated battery, it had to prove Sinclair knowingly caused physical contact in a rude, insulting, or angry manner either with a deadly weapon or in any manner whereby great bodily harm, disfigurement, or death can be inflicted. However, the district court instructed the jury that aggravated battery required proof that Sinclair knowingly caused physical contact with Hoopes either "in a rude, insulting or angry manner with a deadly weapon, a hammer" or "in any manner whereby great bodily harm, disfigurement or death can be inflicted." Thus, the instruction omitted the "rude, insulting or angry manner" requirement from the State's second theory.

In *State v. Green*, 55 Kan. App. 2d 595, 606-09, 419 P.3d 83 (2018), a panel of our court held that the phrases "with a deadly weapon" and "in any manner whereby great bodily harm, disfigurement or death can be inflicted" are synonymous. See 55 Kan. App. 2d at 606 (citing *State v. Ultreras*, 296 Kan. 828, 853-54, 295 P.3d 1020 [2013]). In doing so, the panel noted the rude, insulting, or angry manner requirement applied regardless of how the physical contact was inflicted. *Green*, 55 Kan. App. 2d at 607-09. Using the rationale of *Green*, therefore, the jury instruction given in our case on the

State's second theory is erroneous for omitting the language "in a rude, insulting or angry manner."

The State argues that *Green* was wrongly decided, based on the aggravated battery statute's plain language. This requires statutory interpretation, which appellate courts perform de novo. *State v. Keel*, 302 Kan. 560, Syl. ¶ 4, 357 P.3d 251 (2015). Courts interpret statutes to give effect to the Legislature's intent; this begins by examining the statute's plain language. 302 Kan. 560, Syl. ¶¶ 5-6. When the statute is plain and unambiguous, we need not look to legislative history or canons of construction. 302 Kan. 560, Syl. ¶ 6. But even when the language does not create ambiguity, we may consider various provisions of a statute in pari materia to harmonize them. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, Syl. ¶ 3, 349 P.3d 469 (2015).

The word "manner" is used twice in the statute:  it prohibits physical contact "when done in a rude, insulting or angry *manner* with a deadly weapon, or in any *manner* whereby great bodily harm, disfigurement or death can be inflicted." (Emphasis added.) K.S.A. 2020 Supp. 21-5413(b)(1)(C). The State splices the statute at the disjunctive "or" between "deadly weapon" and "in any manner." It argues that physical contact must be performed in a rude, insulting, or angry manner only if a deadly weapon is used; when there is no deadly weapon, the contact can be in any manner whereby great bodily harm can be inflicted.

But as the *Green* court noted, other sections of the statute which use "in any manner" counsel against this view. 55 Kan. App. 2d at 607-08. There are two types of simple battery:  "causing bodily harm" and "causing physical contact . . . when done in a rude, insulting or angry manner." K.S.A. 2020 Supp. 21-5413(a)(1)-(2). For aggravated battery based on causing bodily harm, the harm must be inflicted "with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2020 Supp. 21-5413(b)(1)(B), (b)(2)(B). These sections indicate to us that the "in

8

any manner" phrase acts as an alternative to using a deadly weapon. Applying that interpretation to aggravated battery based on physical contact, the "rude, insulting or angry manner" requirement is an element regardless of whether the contact occurs with a deadly weapon or in some other way. Thus, applying *Green,* under either of the State's two theories the "rude, insulting or angry manner" element is required.

Here, the district court's instruction omitted the "rude, insulting or angry manner" requirement from the State's second theory of aggravated battery. Because the instruction did not accurately state the applicable law on the State's second theory, the instruction was legally inappropriate, and the court erred by giving it to the jury.

Sinclair argues this omission constitutes clear error. She primarily contends that the jury could have found the physical contact was not performed in a rude, insulting, or angry manner because she responded appropriately to Hoopes' aggression. And Sinclair also complains the alleged affirmative defense and burden of proof errors she has identified compounded the likelihood of that error. In response, the State notes the evidence of Sinclair's angry comments to responding police. The State also contends that it lessened the impact of any potential instruction error during closing arguments when the prosecutor told the jury the State had to prove Sinclair acted in a rude, insulting, or angry manner. We agree with the State that the totality of the evidence before the jury shows that there was no clear error in the omission.

Another way of analyzing the error in the district court's jury instruction on aggravated battery is to determine whether the omission of "a rude, insulting or angry manner" on the State's second theory created a real possibility that the jury would have rendered a different verdict had the omission not occurred. Our Supreme Court has noted that the omission of an element of a crime is subject to a harmless error analysis in which a reviewing court examines the record to determine whether the omitted element was uncontested and supported by such overwhelming evidence that the jury verdict would

9

have been the same without the omission. *State v. Richardson*, 290 Kan. 176, 182, 224 P.3d 553 (2010). Under this standard, a reviewing court "'asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.'" 290 Kan. at 183 (citing *Neder v. United States*, 527 U.S. 1, 19, 119 S. Ct. 1827, 144 L. Ed. 2d 35 [1999]).

After careful consideration, we are convinced that the instruction given by the district court on the elements of aggravated battery does not constitute clear error. And we also conclude that any error in the omission of "in a rude, insulting or angry manner" on the State's second theory of aggravated battery was harmless error under *Richardson* and *Neder*. Although Sinclair initially denied to police that she struck Hoopes with a hammer, overwhelming evidence from the victim's testimony and police photos of Hoopes' injuries demonstrate that she did, in fact, strike him. Given Sinclair's subsequent statements to police that she should have killed Hoopes and should have made sure that his glasses were broken, coupled with her later added comment that she should have murdered Hoopes and broken his hand, a jury could easily find that her actions were rude or angry.

Sinclair's reliance on a self-defense theory does not diminish our conclusion. A successful self-defense argument only justifies a person's actions, it does not mean the person did not commit the underlying crime. In short, we conclude the jury would not have returned a different verdict had it been property instructed on the State's second theory of aggravated battery.

2. *The District Court's Failure to Instruct the Jury on Defense of an Occupied Vehicle*

Sinclair next argues the district court committed clear error by failing to instruct on defense of an occupied vehicle. The defense may have been factually appropriate, but we believe its omission was not clear error.

A criminal defendant is entitled to an instruction on any affirmative defense supported by competent evidence—evidence that would allow a rational fact-finder to reasonably conclude the defense applies. K.S.A. 2020 Supp. 21-5108(c). Defense of an occupied vehicle is one of those affirmative defenses. It permits nondeadly force "when and to the extent that it appears to such person and such person reasonably believes that such use of force is necessary to prevent or terminate such other's unlawful entry into or attack upon such person's . . . occupied vehicle." K.S.A. 2020 Supp. 21-5223(a). This requires both a subjective and objectively reasonable belief that an unlawful entry or attack either is occurring or will occur and that force is necessary to prevent or terminate that conduct. See, e.g., *State v. Andrew*, 301 Kan. 36, 44-45, 340 P.3d 476 (2014) (interpreting similar language in K.S.A. 21-5221 regarding self-defense). The defense of occupied vehicle statute also permits deadly force if a person has a subjective and objectively reasonable belief that deadly force is necessary to prevent imminent death or great bodily harm. K.S.A. 2020 Supp. 21-5223(b). However, subject to exceptions, the defense is unavailable to the person who initially provokes the use of force. See K.S.A. 2020 Supp. 21-5226(c).

The parties agree an instruction on defense of an occupied vehicle would have been legally appropriate. But they dispute whether that instruction would have been factually appropriate. To support her subjective belief, Sinclair notes that she feared Hoopes would break the car window when banging on it and yelling. Objectively, her neighbor—Warren—also stated that Hoopes loudly knocked on the window, and all three

11

witnesses—Sinclair, Hoopes, and Warren—explained Hoopes was yelling. The State asserts Hoopes' loud banging on the window would not lead a reasonable person to conclude he was attacking or trying to enter Sinclair's car. Even if his actions could be viewed as an attack, it ended after Sinclair left her car. And she subjectively did not believe force was necessary to end the attack; although she eventually defended herself, she got out to get away from Hoopes, not to protect her car.

All witnesses agreed Hoopes approached Sinclair's car and began yelling and either knocking or banging on a car window. Hoopes stated he was yelling, "'Why are you still here? What are you doing here?'" But they presented three different versions of how Sinclair used the hammer. Hoopes stated Sinclair swung the hammer as she got out of the car and he was backing up. According to Warren, Sinclair raised the hammer after she got out of the car and yelled at Hoopes at the back of her car. And Sinclair explained she reflexively grabbed the hammer while trying to run away; she tried to defend herself when Hoopes came around the car and threw her to the ground, though she denied using the hammer.

Sinclair's testimony does not reflect a subjective belief that she needed to use force to stop Hoopes from attacking her car. She explained that she grabbed the hammer reflexively, not to defend her car or herself. She left the car to get away, not to confront Hoopes about potentially breaking the window. And when she did use the hammer, it was to defend herself after Hoopes threw her to the ground. Under Sinclair's explanation, she was defending herself, not her vehicle. Her version does not support an instruction on defense of an occupied vehicle.

Hoopes' and Warren's versions could support a subjective belief because Sinclair confronted Hoopes. But a reasonable person would not believe force, especially deadly force, was necessary. Hoopes' yelling and banging on the window suggests he was trying to get Sinclair's attention. This was certainly rude, but that conduct did not rise to a level

requiring the use of force to stop him. According to Sinclair and Warren, getting out of the car was all that was necessary to stop Hoopes. And it was certainly not necessary to use the hammer while leaving the car, as Hoopes testified. No version of testimony reflects that using the hammer to defend the car was objectively reasonable.

Assuming the district court's failure to give a defense of a vehicle instruction was error, Sinclair argues the jury would have returned a different verdict had it been instructed on the defense. She notes the State would have been unable to disprove her defense based on her testimony and Hoopes' lack of credibility. And Sinclair contends the jury's request that the court define "retreat" suggests the jury believed she was the initial aggressor, precluding her from using force.

But if Hoopes was the initial aggressor when he attacked the car, Sinclair would have acted properly in defending her car. The State notes Warren's version more closely matched Hoopes' recollection than Sinclair's version. Sinclair also made less than credible statements to the police. And the jury's question about retreat only indicates they considered all the instructions.

Had the jury been instructed on defense of an occupied vehicle, we believe it is unlikely it would have rendered a different verdict. To convict Sinclair, the jury had to find she used a deadly weapon or acted in any manner that could result in great bodily harm, disfigurement, or death. See *Green*, 55 Kan. App. 2d at 606 (noting terms are synonymous). The jury did so, likely because of the hammer. But a person may only use deadly force in defense of an occupied vehicle when necessary to prevent imminent death or great bodily harm. K.S.A. 2020 Supp. 21-5223(b). For the defense to apply, the jury would need to find Hoopes' yelling and banging on the car window created a subjective and objectively reasonable belief that Sinclair faced imminent death or great bodily harm.

13

Our review of the record does not reveal that those beliefs existed. Sinclair was concerned Hoopes would break the window, leaving her with no place to live. And the ultimate contact Sinclair alleged—Hoopes grabbing her shoulder and throwing her to the ground—does not entail imminent death or great bodily harm. Her use of the hammer was disproportionate to the threat Hoopes posed. Sinclair cannot meet the clear error standard. We conclude that any error in failing to provide the defense of an occupied vehicle instruction does not require reversal.

3. *The Burden of Proof Instruction*

Finally, Sinclair argues the district court erred by providing an incomplete burden of proof instruction regarding her affirmative defense. But we find that the instructions as a whole correctly stated the applicable law.

At trial, the district court instructed the jury generally on affirmative defenses, stating: "The defendant raises self-defense as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State's burden of proof does not shift to the defendant." This reflected the language of PIK Crim. 4th 51.050 (2017 Supp.). See *State v. Becker*, No. 119,122, 2019 WL 1976422, at *5 (Kan. App. 2019) (unpublished opinion). However, a later supplement to the pattern instructions added the language: "The State has the burden to disprove this defense beyond a reasonable doubt." See *State v. Reese*, No. 120,597, 2021 WL 69309, at *3 (Kan. App. 2021) (unpublished opinion) (quoting PIK Crim. 4th 51.050 [2019 Supp.]), *rev. denied* 313 Kan. 1045 (2021). Separately, the court instructed the jury on the State's burden of proof and the specific application of self-defense.

Sinclair argues the district court erred by omitting the most important part of the affirmative defense instruction—the State's burden of proof—though it notes that

information could have been gleaned from other instructions. The State, relying on *State v. Buck-Schrag*, 312 Kan. 540, 477 P.3d 1013 (2020), asserts the instructions as a whole accurately stated the law.

The same argument—the omission of the State's burden of proof in an affirmative defense instruction—was raised in *Buck-Schrag*. 312 Kan. at 551. There, our Supreme Court found an affirmative defense instruction that omitted the State's burden of proof fairly and accurately stated the law. The court noted that in *State v. Staten*, 304 Kan. 957, 964-67, 377 P.3d 427 (2016), the failure to give an affirmative defense instruction was error but not clearly erroneous in light of other instructions describing the burden of proof. *Buck-Schrag*, 312 Kan. at 551-52. But the district court in Buck-Schrag's case gave an affirmative defense instruction and separately described the State's burden of proof. 312 Kan. at 552-54. Viewed collectively, the Supreme Court held these instructions accurately stated the law. 312 Kan. at 554.

Just as in *Buck-Schrag*, the district court in our case gave a general instruction on affirmative defenses. It also provided instructions on the State's burden of proof and when self-defense applies. Taken together, these instructions accurately stated the law. The court did not err.

*Alleged Instances of Prosecutorial Error*

Sinclair argues the State committed prosecutorial error during closing arguments by diluting its burden of proof and twice misstating the applicable law. One instance—referring to the need to use self-defense in light of imminent deadly force, rather than unlawful force—did misstate the law. But the error was brief and harmless. The other errors—misstating the law on the affirmative defense concerning an occupied vehicle that was not given and diluting the State's burden of proof—were not errors.

15

A prosecutor generally has wide latitude to make arguments and pursue a strategy to obtain a conviction. But a prosecutor exceeds that wide latitude when those arguments or strategies infringe a defendant's constitutional right to a fair trial. When sufficiently egregious, an error warrants a new trial. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

We review allegations of prosecutorial error in two steps. First, we must determine whether any error exists. 305 Kan. at 109. A prosecutor errs by misstating the applicable law or diluting the State's burden of proof. *State v. Thomas*, 307 Kan. 733, 743, 415 P.3d 430 (2018); *State v. Pribble*, 304 Kan. 824, Syl. ¶ 6, 375 P.3d 966 (2016). Whether an error occurred depends on the context in which the statement was made. *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019). Second, we assess the error's prejudice. *Sherman*, 305 Kan. at 109. An error is harmless if the State shows beyond a reasonable doubt that the error did not affect the verdict—that is, there is no reasonable possibility of prejudice—in light of the record as a whole. 305 Kan. at 109. Although various factors may exacerbate or mitigate an error, the primary focus centers on the error's impact on the verdict. 305 Kan. at 111.

1. *The Prosecutor's Alleged Misstatements of Law*

Sinclair argues the State misstated the law regarding self-defense and defense of an occupied vehicle. The record reveals that the prosecutor did err by briefly referring to self-defense as applicable to the threat of deadly force, not unlawful force, but we believe the brief mention was harmless. And because the district court did not instruct on defense of an occupied vehicle, the prosecutor either did not err or the error was harmless.

At closing arguments, the prosecutor discussed the subjective and objectively reasonable belief requirements for self-defense. After reading the self-defense jury instruction and discussing the objective requirement, the prosecutor stated:

16

"So even if you believe that Ms. Sinclair honestly believed that she was so frightened and was under imminent attack of the threat of *deadly force* that she needed to exit her safe place and go out and confront this attacker by using a hammer, even if you honestly believe that, would a reasonable person in the same situation believe that? No and heck no." (Emphasis added.)

The prosecutor then argued how a reasonable person would have behaved in a similar situation.

And during rebuttal, the prosecutor argued that Sinclair got out of her car to attack Hoopes, not because she believed Hoopes would break the window. The prosecutor stated:

"If the defendant was afraid that Mr. Hoopes was going to break her car window in, she knew she had that hammer. She could use that hammer to defend herself just as well inside the car if she honestly believed that Mr. Hoopes, whom she had known for years and that there'd never been a history of violence from, was going to enter her car."

Instead, as observer Warren described the situation, Sinclair got out of the car, and she and Hoopes began yelling at each other.

Sinclair asserts the first argument was a misstatement of the law because self-defense is justified to defend against another person's imminent use of unlawful force, not deadly force. And the second misstates defense of an occupied vehicle because that defense does not require someone to wait until damage has occurred; a person may act to prevent or terminate an unlawful entry or attack upon an occupied vehicle. In its response, the State argues Sinclair is equitably estopped from raising the occupied vehicle defense as grounds for prosecutorial error because she approved the State's instructions and did not request that instruction. Sinclair contends the equitable estoppel doctrine only applies to civil cases.

17

When a person engages in voluntary conduct, equitable estoppel precludes that person from asserting rights against another person who relied on that conduct. See *Steckline Communications, Inc. v. Journal Broadcast Group of Kansas, Inc.*, 305 Kan. 761, 769, 388 P.3d 84 (2017) (quoting *United American State Bank v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. 523, 526-27, 561 P.2d 792 [1977]). The doctrine applies when "(1) another party induced reliance on certain facts, (2) the party asserting estoppel reasonably relied upon those facts, and (3) that party was prejudiced by its reliance." *Becker v. The Bar Plan Mutual Insurance Co.*, 308 Kan. 1307, 1316, 429 P.3d 212 (2018). The facts must arise by the other party's "acts, representations, admissions, or silence when it had a duty to speak." *Steckline*, 305 Kan. at 769 (quoting *United American State Bank*, 221 Kan. at 527).

Whatever the doctrine's extent, it does not apply here. Equitable estoppel concerns reliance on certain facts. But Sinclair's failure to raise a legal theory concerns an argument, not a fact. That does not mean Sinclair's argument requires reversal; it is difficult to imagine a scenario where a prosecutor's misstatement of a law about a legal theory not before the jury will prejudice a defendant. But without more thorough briefing on whether equitable estoppel applies to criminal cases, we will review any alleged error under the prosecutorial error framework.

The prosecutor's first statement—concerning deadly force—was likely error. The prosecutor appears to have misspoken, referring to deadly force instead of unlawful force. But we find this lapse to be harmless. The jury instructions correctly stated the self-defense standard, the prosecutor had read the standard before making the statement, and the statement was fleeting.

The second statement—discussing Sinclair's ability to defend herself inside the car—was not error. The prosecutor was commenting on the sincerity of Sinclair's testimony that she believed Hoopes would break the window. But even if it was error as

misstating the law on defense of an occupied vehicle, any error was harmless; we conclude there is no real possibility a jury would have acquitted Sinclair on an affirmative defense that was not raised at trial by the defendant.

2. *The Prosecutor's Use of the Word "Believe"*

Sinclair also asserts the State committed prosecutorial error by stating she was not entitled to a self-defense instruction if the jury *believed* Hoopes' account of events. This did not dilute the State's burden of proof and was not error.

During closing arguments, the prosecutor explained that self-defense does not apply when someone is the initial aggressor. After describing the discrepancies between Sinclair's, Hoopes', and Warren's testimony, the prosecutor stated:

> "Brad Hoopes said, 'The first blow knocked the glasses off my face. I couldn't see. I was down on the ground trying to find my glasses.' And, ladies and gentlemen, I submit to you that is consistent with the physical injuries on his body, the marks on his back, because he was the one down on the ground, with Ms. Sinclair repeatedly striking him. And if you *believe* that is the case, she's not entitled to a self-defense instruction." (Emphasis added.)

The prosecutor went on to argue that if the jury considered self-defense, Sinclair lacked a subjective and objectively reasonable belief that self-defense was necessary.

Sinclair argues the use of the word "believe" diminished the State's burden of disproving her affirmative defense beyond a reasonable doubt. But she reads too much into the State's word choice. The State was not attempting to dilute its burden of proof. It simply highlighted the result the jury should reach if it credited Hoopes' testimony. The prosecutor did not err when using the word "believe" during closing arguments.

19

*Cumulative Error*

Next, Sinclair argues the culmination of these errors deprived her of a fair trial. Multiple errors may require reversal if the combined prejudicial effect deprives the defendant of a fair trial. *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011).

The test for cumulative error is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial given the totality of the circumstances. In making the assessment, we must examine the errors in context, consider how the district court addressed the errors, review the nature and number of errors and whether they are connected, and weigh strength of the evidence. *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020).

If any of the errors being aggregated are constitutional, a constitutional harmless error test applies, and the party benefitting from the errors must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome. *Tully*, 293 Kan. at 205. Where, as here, the State benefitted from the errors, it has the burden of establishing the errors were harmless. *State v. Akins*, 298 Kan. 592, 600, 315 P.3d 868 (2014).

Here, we consider the district court's error in jury instruction No. 9 on the elements of aggravated battery under the State's second theory, and the prosecutor's erroneous closing remark by briefly referring to the self-defense requirement as deadly force instead of unlawful force. And the court may have erred by not instructing on defense of an occupied vehicle.

When heightened review for constitutional error applies to one of the deficiencies—as it does for the prosecutor's misstatement of the of the law in closing argument—that standard governs the cumulative error analysis. As we have noted, the

20

State has to convince us beyond a reasonable doubt that the errors did not affect the outcome of the trial. *State v. Ward*, 292 Kan. 541, 569-70, 256 P.3d 801 (2011).

After careful consideration we have concluded that these errors did not deprive Sinclair of a fair trial. The prosecutor's misstatement of the law in closing argument was ultimately harmless; it was both brief and preceded by a correct statement of the law. Likewise, the jury instructions on self-defense accurately informed the jury on the legal standards it was to apply to the evidence. Evidence indicates Sinclair acted in a rude, insulting, or angry manner when hitting Hoopes with a hammer. She likely would not have prevailed had a defense of an occupied vehicle instruction been given because her force was disproportionate to Hoopes' threat. And these errors were discrete; no error compounded another error. In short, we are convinced beyond a reasonable doubt that the errors cited by Sinclair did not deprive her of a fair trial. Thus, cumulative error does not apply in this case.

*Section 5 of the Kansas Constitution Bill of Rights and Criminal History*

Finally, Sinclair challenges the constitutionality of the revised Kansas Sentencing Guidelines Act, arguing the failure to submit a prior conviction to a jury violates section 5 of the Kansas Constitution Bill of Rights. But the Act is not unconstitutional under section 5, and the court did not err by using Sinclair's prior conviction to determine her sentence.

In *State v. Albano*, 313 Kan. 638, 657, 487 P.3d 750 (2021), our Supreme Court concluded section 5 does not require prior convictions to be submitted and proven to a jury when used to determine a sentence. Rather, determining and imposing a criminal sentence falls squarely within the ambit of the trial court judge. 313 Kan. at 657. Here, the State was not required to prove Sinclair's prior convictions to a jury. The Kansas

Sentencing Guidelines do not violate section 5, and the court acted properly when considering Sinclair's prior conviction to determine her sentence.

Affirmed.

* * *

ATCHESON, J., concurring:  Although the majority correctly concludes the Douglas County District Court erred by omitting an element of aggravated battery when it instructed the jury on what the State had to prove to convict Defendant Patricia E. Sinclair, I am not especially enticed by the reasoning behind that conclusion. The majority, likewise, undervalues the fundamental harm that sort of error imposes on criminal defendants and underplays the especially rigorous analysis required to declare the resulting constitutional deprivation harmless. Properly applied, the test for harmlessness when a district court fails to instruct a jury on every element of a charged crime, nonetheless, does not require the reversal of Sinclair's conviction in light of the trial evidence. The other points Sinclair has raised on appeal do not undermine the jury's guilty verdict. I concur in the result and, therefore, would affirm Sinclair's conviction and sentence. I offer some comments explaining my path to our shared conclusion.

FACTUAL AND PROCEDURAL PROGRESSION

The trial evidence showed that Sinclair had apparently begun living in her car and frequently parked it near the house from which she had been evicted. Sinclair's behavior rankled at least some of the people who resided in the Lawrence neighborhood. After drinking more than he probably should have one evening, Brad Hoopes walked from his house to Sinclair's car and began pounding on the passenger's side window as Sinclair apparently dozed in the driver's seat. Sinclair got out of the car. She and Hoopes came face-to-face at the rear of the car. A neighbor heard them yelling but couldn't make out

22

what they were saying. She saw Sinclair raise and lower her arm and Hoopes fall to the pavement. The woman believed Sinclair had something in her hand but could not tell what.

Sinclair was about 70 years old, slight of build—considerably smaller than Hoopes—and afflicted with various physical ailments. She was also likely mentally unstable, although the record isn't entirely clear about the nature of her instability. Sinclair asserted Hoopes knocked her to the ground. But her account doesn't square with what the neighbor saw and reported to the police. There is no real dispute that Sinclair struck Hoopes with a hammer as they stood behind her car. The initial blow knocked Hoopes's glasses off. And he went to the pavement to find them. Sinclair then hit him in the back several times with the hammer. She returned to her car and locked the doors.

Lawrence police officers arrived fairly quickly and obtained recorded statements from Hoopes and Sinclair. Hoopes gave a rambling account punctuated with slurred words and occasionally fragmented expressions. He told the police the residents had been trying to get Sinclair to go elsewhere and he wanted to get her arrested. For her part, Sinclair was obstreperous and less than fully cooperative with the police. In speaking to the police, she was loud and angry and offered bellicose regrets she had not inflicted more serious injuries on Hoopes or killed him. But she also told the police she did not hit Hoopes with a hammer. A police officer found a hammer on the driver's side floor of Sinclair's car. The State offered the hammer as a trial exhibit. From a photograph in the record on appeal, it appears to be a standard claw hammer, consistent with Hoopes' description.

The State charged Sinclair with one count of aggravated battery, a severity level 7 person felony violation of K.S.A. 2016 Supp. 21-5413(b)(1)(C), on the alternative grounds set out in that subsection. The statute, in pertinent part, defines the severity level 7 forms of the crime this way:

23

"(b) Aggravated battery is:

"(1)(A) [omitted];

"(B) knowingly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted; or

"(C) knowingly causing physical contact with another person when done in a rude, insulting or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2020 Supp. 21-5413(b).

Depending on the criminal acts and the defendant's intent, aggravated battery can be a severity level 4, 5, 7, or 8 offense, with commensurately varied punishments under the sentencing guidelines.

Sinclair testified in her defense at trial. She told the jurors she could not recall striking Hoopes with the hammer but did not deny having done so. Sinclair testified the banging on the car window frightened her and, as she tried to escape, she and Hoopes met at the rear of the vehicle. She and the prosecutor fenced on cross-examination over whether she was angry with Hoopes when they came face-to-face. Sinclair characterized herself as "terrorized" rather than angry. From opening statement to closing argument, Sinclair's lawyer presented the case to the jurors as one of self-defense, effectively acknowledging Sinclair had struck Hoopes.

Instructing juries on aggravated battery can be something of a snake pit, given the various ways the crime can be committed and the layers of lesser included offenses that may be in play in a particular case. Here, the district court ventured into the snake pit to fashion an instruction for the alternative statutory bases for the charge against Sinclair— an exercise that required parsing the wording of K.S.A. 2016 Supp. 21-5413(b)(1)(C).

The district court relied on the then current version of PIK Crim. 4th 54.310 that described one way of committing aggravated battery under K.S.A. 2016 Supp. 21-5413(b)(1)(C) as a defendant's physical contact with the victim using a deadly weapon

when done in a rude, insulting, or angry manner and described the other way as defendant's physical contact with the victim in any manner whereby great bodily harm, disfigurement or death can be inflicted. So, as set out in the majority opinion, the instruction the district court provided the jury looked like this:

"Instruction No. 9

"The defendant is charged with the crime of aggravated battery. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant knowingly caused physical contact to Bradford J. Hoopes in a rude, insulting or angry manner with a deadly weapon, a hammer, and

"2. That this act occurred on or about the 20th day of March, 2017, in Douglas County, Kansas.

"OR

"1. The defendant knowingly caused physical contact with Bradford J. Hoopes in any manner whereby great bodily harm, disfigurement or death can be inflicted.

"2. This act occurred on or about the 20th day of March, 2017, in Douglas County, Kansas.

"A 'deadly weapon' is an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury."

Neither the prosecutor nor Sinclair's lawyer objected to the instruction as given. The district court also instructed the jurors on the law governing self-defense, and Sinclair does not complain about those instructions. The jurors returned a general verdict convicting Sinclair of aggravated battery, so we have no way of knowing which alternative outlined in the elements instruction they relied on.

Although Sinclair raises several issues on appeal, I focus on her challenge to the jury instruction on the elements of aggravated battery. This claim has two components. First, did the instruction erroneously omit a required element in the second described form of aggravated battery? And, if so, did the omission sufficiently compromise Sinclair's constitutional right to a fair trial to require reversal of the guilty verdict? I address those questions and then comment briefly on other points on appeal.

*Instruction was Erroneous*

I agree with my colleagues that the aggravated battery instruction should have required the jury to find that Sinclair's physical contact with Hoopes was done in a rude, insulting, or angry manner under each of the alternative charges and not just under the one entailing the use of a deadly weapon. But I find the reasons they advance for their conclusion here, reciting those offered in *State v. Green*, 55 Kan. App. 2d 595, 606-09, 419 P.3d 83 (2018), to be largely unconvincing.

Rather, I am principally persuaded the instruction was erroneous based on a comparison of the statutory language criminalizing similar, though identifiably different, conduct in K.S.A. 2020 Supp. 21-5413(b)(1)(B) and K.S.A. 2020 Supp. 21-5413(b)(1)(C). The Legislature classified the conduct proscribed in each subsection as severity level 7 crimes. That's significant here because crimes grouped in the same level are statutorily and, thus, legislatively "considered to be relatively equal in severity." K.S.A. 2020 Supp. 21-6807(a). As I have said, severity level, along with a particular defendant's criminal history, corresponds directly to the presumptive punishment fixed in the sentencing guidelines. In a very real sense, then, the severity levels assigned crimes reflect a legislative determination of their comparative moral and legal blameworthiness or, in a word, wickedness.

So K.S.A. 2020 Supp. 21-5413(b)(1)(B) criminalizes causing *bodily harm* to a person with a deadly weapon or in a manner whereby great bodily harm, disfigurement, or death could result. It does not require any sort of rude, insulting, or angry behavior. Conversely, K.S.A. 2020 Supp. 21-5413(b)(1)(C) criminalizes *physical contact* in the same way—with a deadly weapon or in a manner whereby great bodily harm, disfigurement, or death could result. Causing mere physical contact with a person necessarily should be considered less blameworthy or wicked than inflicting bodily harm on him or her. For the crimes outlined in those two subsections to be of comparable severity, then, the physical contact proscribed in K.S.A. 2020 Supp. 21-5413(b)(1)(C) must be accompanied by rude, insulting, or angry behavior whether accomplished with a deadly weapon or in a manner whereby great bodily harm, disfigurement, or death might result. Otherwise, causing physical contact with or bodily injury to a person would be equally blameworthy, so long as each was done in a manner whereby great bodily harm, disfigurement, or death might result. That outcome is facially and logically difficult to justify standing alone and becomes much less tenable when the same cannot be said of physical contact and bodily injury involving the use of a deadly weapon. The language in K.S.A. 2020 Supp. 21-5413(b)(1)(C) obviously requires physical contact with a deadly weapon to be done in a rude, insulting, or angry manner to be treated as an aggravated battery, while K.S.A. 2020 Supp. 21-5413(b)(1)(B) does not put the same condition on bodily harm done with a deadly weapon. The added condition also must apply to the other physical contact criminalized in K.S.A. 2020 Supp. 21-5413(b)(1)(C), maintaining the parity in blameworthiness and presumptive punishment.

What we have in K.S.A. 2020 Supp. 21-5413(b)(1)(C), then, is a statute that in part criminalizes "physical contact with another person when done in a rude, insulting or angry manner. . . in any manner whereby great bodily harm, disfigurement or death can be inflicted." The phrasing may itself be an aggravated battery of the English language. Statutes, however, need not be mellifluous or idiomatic and quite often are neither; they

27

have to be comprehensible. And K.S.A. 2020 Supp. 21-5413(b)(1)(C) meets that standard. It is neither vague nor ambiguous.[*]

[*] A jury instruction setting out that element would not need to replicate the somewhat disjointed expression in the statute. Instructions must accurately state the law, but they need not do so by borrowing verbatim language from statutes or judicial opinions. Those sources often will be poor substitutes for plain English lay jurors may find significantly more informative and digestible. See *State v. Weaver*, 198 Wash. 2d 459, 466, 496 P.3d 1183 (2021) (standard for clarity in jury instruction higher than for statute); *United States v. Delaney*, 717 F.3d 553, 555-56 (7th Cir. 2013) (use of "abstract and archaic" statutory language in jury instructions "must be confusing"); *State v. Hutchens*, No. 119,661, 2020 WL 1329181, at *17-18 (Kan. App.) (Atcheson, J., concurring in part and dissenting in part) (risk in crafting jury instructions with language lifted directly from judicial opinions), *rev. denied* 312 Kan. 897 (2020). Jurors could be informed they would have to find a defendant "knowingly caused physical contact with [the alleged victim] in a rude, insulting, or angry manner whereby great bodily harm, disfigurement, or death could be inflicted." The language eliminates the clunky and largely redundant phrase "in any manner," while retaining the import of the statutory element.

Here, the jurors were never instructed they had to find beyond a reasonable doubt (or at all, for that matter) that Sinclair acted rudely, insultingly, or angrily to convict her of aggravated battery for menacing Hoopes in a manner whereby she could have inflicted great bodily harm or disfigurement or killed him. As far as we know and as we must presume from this record, they did just that when they found Sinclair guilty, since the uncertainty of a general verdict in a criminal case falls on the State when it comes to the legal sufficiency of the jury's determination. See *Yates v. United States*, 354 U.S. 298, 312, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957) (verdict should be set aside "where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected"); *State v. Skelton*, 247 Kan. 34, 50, 795 P.2d 349 (1990). The jury instruction was legally inappropriate and, thus, erroneous because it omitted an element of one of the alternative aggravated battery charges submitted to the jurors. See *State v. Crum*, 286 Kan. 145, Syl. ¶ 5, 184 P.3d 222 (2008) (upon defendant's not guilty plea, prosecution has burden to prove each element of charged crime beyond reasonable

28

doubt); cf. *State v. Wilkerson*, 278 Kan. 147, 158, 91 P.3d 1181 (2004) (Although several of the jury instructions could have been "improved," the instructions, taken as a whole, correctly state the law and, thus, did not prejudice the defendant.).

*Error Implicated Sinclair's Constitutional Rights*

The omission of an element of the charged crime from an instruction and, thus, from the jurors' consideration compromises a defendant's fundamental rights in several related ways. First, the error degrades the United States Constitution's Sixth Amendment right to jury trial, since the jurors cannot consider what they have never been told to consider. Cognate constitutional rights to a unanimous verdict and proof of guilt beyond a reasonable doubt also necessarily go by the wayside. *Ramos v. Louisiana*, 590 U.S. ___, 140 S. Ct. 1390, 1397, 206 L. Ed. 2d 583 (2020) (Sixth Amendment right to unanimous jury verdict in criminal cases incorporated through Due Process Clause of Fourteenth Amendment to United States Constitution and, therefore, applicable, to State prosecutions); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (constitutional due process requires government to prove beyond a reasonable doubt every fact necessary to convict defendant). In short, many of a criminal defendant's essential protections against wrongful conviction are left asunder when a district court omits an element of a charged crime from the jury instructions.

For that reason, the United States Supreme Court has recognized the error to be sufficiently pernicious to trigger an enhanced review for constitutional harmlessness. *Neder v. United States*, 527 U.S. 1, 17, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). To assess the adverse impact when a jury has not been presented with an element of the charged crime, the reviewing court should apply the test for constitutional error drawn from *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), and, therefore, must conclude "'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder*, 527 U.S. at 15 (quoting *Chapman*, 386

29

U.S. at 24). In doing so, the court has to find the omitted element was "uncontested and supported by overwhelming evidence" during the trial to declare the error constitutionally harmless. 527 U.S. at 17.

The Kansas Supreme Court embraced and applied the *Neder* test in *State v. Daniels*, 278 Kan 53, 62-63, 91 P.3d 1147 (2004), and again in *State v. Richardson*, 290 Kan. 176, 182-83, 224 P.3d 553 (2010). In those cases, the court relied on the rule in *Neder* to inform its review of the challenged elements instructions under the clearly erroneous standard because the defendants failed to lodge trial objections. *Richardson*, 290 Kan. at 178; *Daniels*, 278 Kan. at 57. The stringent requirements outlined in *Neder* for harmless constitutional error in the face of an element omitted from a jury instruction, therefore, govern here.

In a precursor to *Neder*, the United States Supreme Court held that because the defendant failed to object at trial to the omission of an element from the jury instruction on a perjury charge, a plain or clear error standard applied. *Johnson v. United States*, 520 U.S. 461, 470, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997). The Court found the error to be plain but harmless nonetheless, precisely because the evidence bearing on the omitted element was "'overwhelming'" and "essentially uncontroverted at trial." 520 U.S. at 470. In *Neder*, the Court relied on *Johnson* to support a finding of harmlessness there, despite the defendant's objection to the jury instruction, and ultimately applied a comparable test in arriving at that conclusion. 527 U.S. at 9-10. In turn, in *Daniels*, the Kansas Supreme Court specifically incorporated *Neder*'s reliance on *Johnson* to outline the proper analysis of an omitted element claim when the defendant had not objected to the deficient instruction at trial. *Daniels*, 278 Kan. at 61.

Without acknowledging the procedural posture of *Richardson* and *Daniels*, the court has since suggested the *Neder* test should be "relaxed" under the clear error standard in K.S.A. 22-3414(3) when a defendant has not objected to the omitted element.

30

*State v. Jarmon*, 308 Kan. 241, 244, 419 P.3d 591 (2018). But the *Jarmon* court applied something closely resembling the *Neder* test despite the lack of the defendant's trial objection. 308 Kan. at 245-46 (finding no clear error because evidence about the omitted element of a burglary charge—the elements of theft as the underlying crime the defendant intended to commit upon entering the building—was "overwhelming and was never directly contested"). Although *Jarmon* did not mention *Johnson*, it functionally used the same test for harmlessness the Court fashioned in *Johnson* under a plain or clear error standard and then transplanted to *Neder*.

*Majority Fails to Robustly Apply Correct Test for Harmless Error*

The majority pronounces a pallid facsimile of the required harmless error test to conclude the omitted element did not compromise Sinclair's constitutional rights bound up in a fundamentally fair trial. While ultimately coming to the same conclusion, I offer a detailed description of how I arrive there and, I suppose, a more rigorous assessment of the rights.

Applying the proper harmless error analysis—the *Neder* test—to the trial record, a reviewing court could not resolutely conclude the evidence bearing on whether Sinclair struck Hoopes in a rude, insulting, or angry manner was both uncontested and overwhelming as to each of those conditions. But had the jurors been instructed on that element with respect to the alternative aggravated battery charge, they properly could have relied on any one of the three to convict Sinclair. So if the trial evidence satisfied the *Neder* test as to one of them, then Sinclair suffered no legal prejudice.

The record shows the element was contested and subject to conflicting evidence on whether Sinclair was angry. In closing argument, the prosecutor told the jurors they could conclude Sinclair was angry when she hit Hoopes with the hammer and they ought to rely on her demeanor when she spoke to the police immediately after the incident in

31

reaching their conclusion. Conversely, Sinclair's lawyer emphasized to the jurors that Sinclair acted reasonably and in self-defense to ward off Hoopes.

While cross-examining Sinclair, the prosecutor sought to develop evidentiary ammunition for that aspect of her closing argument. The prosecutor asked Sinclair if she was angry when she talked to the police. Sinclair agreed she was angry then because she "was a victim and [was] being taken away." In response to another question, Sinclair described herself as "terrorized" when Hoopes banged on her car window and as acting "to defend myself." Later in the cross-examination, the prosecutor asked Sinclair to agree, "You really weren't afraid of Mr. Hoopes; you were angry with him." But Sinclair demurred and replied, "I was afraid of Mr. Hoopes." The questioning of Sinclair coupled with the prosecutor's closing argument amply showed the issue of her demeanor— specifically whether she acted angrily when she engaged with Hoopes—was contested and subject to disputed evidence.

But the same may not be said of whether Sinclair acted rudely when she struck Hoopes with the hammer. Neither Sinclair's lawyer nor the prosecutor argued to the jurors about whether Sinclair acted rudely. And they did not question Sinclair or the other witnesses about the rudeness. Still, the trial evidence that Sinclair used the hammer on Hoopes was for all intents and purposes uncontroverted. Hoopes testified she did, and he had bruises on his back and an abrasion on his nose corresponding to the blows he described. The neighbor's observations from her porch were consistent with Sinclair hitting Hoopes with a hammer while the two were standing at the rear of the car. Although Sinclair denied hitting Hoopes when she spoke to the police, she also made contradictory declarations to them about wishing she had inflicted greater harm on him. At trial, Sinclair never denied hitting Hoopes with the hammer and simply told the jurors she could not remember if she had. Moreover, Sinclair's lawyer tried the case on a self-defense theory that necessarily rested on a legal justification for the hammer blows rather than a factual denial of them.

The district court thoroughly instructed the jurors on self-defense—Sinclair does not suggest otherwise. The jurors found insufficient evidence of self-defense to raise a reasonable doubt about Sinclair's guilt. Self-defense amounts to a privilege or justification for conduct, typically the use of force, that otherwise would be unlawful and likely criminal. See *Estate of Randolph v. City of Wichita*, 57 Kan. App. 2d 686, 696, 459 P.3d 802 (2020). The jury's collective rejection of Sinclair's assertion of self-defense necessarily means Sinclair's contact with Hoopes was unprivileged or, in other words, without legal justification. And that conclusion is unaffected by the omitted element of the aggravated battery charge. We, therefore, may consider the legal and factual ramifications of the jury's determination.

In turn, the undisputed facts coupled with the jury's rejection of Sinclair's claim of self-defense establish her conduct in striking Hoopes with the hammer necessarily would have been rude. By common definition, "rude" means "discourteous" or "unmannerly." Webster's New World Dictionary College Dictionary 1270 (5th ed. 2016) (defining "rude"). That meaning applies here. See *State v. Baumgarner*, 59 Kan. App. 2d 330, 334-35, 481 P.3d 170 (2021) (words in statute generally should be given their ordinary meaning). In tandem, the undisputed evidence and the jury's determination on self-defense show that Sinclair came face-to-face with Hoopes at the rear of her car and without any legal justification or excuse hit him once in the face with a hammer and at least several more times in the back. Such unprivileged physical contact is definitionally rude. During the trial, that point was never contested (in contrast to whether Sinclair acted angrily).

Consistent with *Neder*, *Richardson*, and *Daniels*, those circumstances also show Sinclair suffered no prejudicial constitutional harm when the jurors were not instructed on the rude, insulting, or angry element of aggravated battery in the alternative charge based on physical contact in a manner whereby great bodily harm, disfigurement, or death might be inflicted. Filtered through the jury's unassailable rejection of self-defense

33

as creating even a reasonable doubt about Sinclair's legal justification for striking Hoopes, the undisputed and overwhelming trial evidence—establishing that Sinclair did, in fact, hit Hoopes with a hammer—depicted rude conduct. So as to what happened between Sinclair and Hoopes at the rear of her car, the element omitted from the jury instruction amounted to harmless error notwithstanding the interlocking constitutional rights implicated by the omission.

*Sinclair's Remaining Issues on Appeal*

• For the first time on appeal, Sinclair complains the district court should have instructed the jury on the privileged use of force to prevent an "attack upon" or "unlawful entry" into an occupied vehicle under K.S.A. 2020 Supp. 21-5223. Because Sinclair did not request the instruction at trial, we review for clear error. The instruction would not appear to be factually appropriate. When Sinclair struck Hoopes, her car was unoccupied. She was the only person who was in the car when Hoopes pounded on the window, and she got out before they confronted each other. Had Sinclair rolled down the window and swung the hammer at Hoopes while she remained in the car, the instruction presumably would have been appropriate.

• Again, for the first time on appeal, Sinclair challenges the instructions the district court used to inform the jurors how they should consider self-defense as an affirmative defense to the aggravated battery charge. She contends the then-current pattern instructions the district court used failed to fully explain that self-defense evidence merely had to raise a reasonable doubt about her guilt to require an acquittal. The Kansas Supreme Court foreclosed this argument in *State v. Buck-Schrag*, 312 Kan. 540, 553-54, 477 P.3d 1013 (2020), especially when we review for clear error.

I have been critical of how the pattern instructions addressed affirmative defenses and in particular self-defense in aggravated battery cases. They failed to clearly tell the

jurors that if they entertained a reasonable doubt about guilt based on the defense, they should return a not guilty verdict. See *State v. Staten*, No. 108,305, 2015 WL 423644, at *23-24 (Kan. App. 2015) (unpublished opinion) (Atcheson, J., concurring), *aff'd* 304 Kan. 957, 377 P.3d 427 (2016). But the Kansas Judicial Council committee charged with drafting the pattern jury instructions for criminal trials recently revised PIK Crim. 4th 51.050, the general instruction on affirmative defenses, to add this sentence: "The State has the burden to disprove this defense beyond a reasonable doubt." PIK Crim. 4th 51.050 (2020 Supp.). The change accurately reflects the statutory treatment of affirmative defenses in criminal cases under K.S.A. 2020 Supp. 21-5108(c) and represents a laudatory giant step toward fully and fairly informing jurors on how to assess those defenses. See *Buck-Schrag*, 312 Kan. at 553 (suggesting jury instruction on affirmative defenses "[a]rguably . . . could have been clearer" with such language).

• Sinclair has also asserted prosecutorial error in closing argument, sought reversal based on cumulative trial error, and challenged how her criminal history has been determined. I agree with my colleagues that Sinclair has failed to establish any basis for relief on those grounds and join in the majority opinion's disposition of them.